ACCEPTED
03-15-00596-CV
8332526
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/21/2015 4:56:48 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00596-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/21/2015 4:56:48 PM
JEFFREY D. KYLE
Clerk

GRACY WOODS I NURSING HOME

*APPELLANT*

v.

MARTHA MAHAN, AS THE REPRESENTATIVE
OF THE ESTATE OF MARY RIVERA

*APPELLEE*

ON INTERLOCUTORY APPEAL FROM
THE 250TH JUDICIAL DISTRICT, TRAVIS COUNTY, TEXAS

**APPELLEE'S BRIEF**

Jack Modesett, III
Texas Bar No. 14244337
Walter V. Williams
Texas Bar No. 21584800
**MODESETTWILLIAMS, PLLC**
515 Congress Avenue, Suite 1650
Austin, Texas 78701
512-472-6097 – Telephone
512-481-0130 – Telecopier
jack@modesettlaw.com
**ATTORNEYS FOR APPELLEE**

**ORAL ARGUMENT REQUESTED**

## IDENTITIES OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.1(a), Appellee certifies that the following is a complete list of all parties to this litigation and the names and addresses of all counsel.

| Party | Appellate Counsel | Trial Counsel |
|---|---|---|
| Grace Woods I Nursing Home, Appellant | Emily J. Davenport<br>Janice Byington<br>Reed, Claymon, Meeker & Hargett, PLLC<br>5608 Parkcrest Dr. Suite 200<br>Austin, Texas 78731<br>edavenport@rcmhlaw.com<br>jbyington@rcmhlaw.com | Emily J. Davenport<br>Janice Byington<br>Reed, Claymon, Meeker & Hargett, PLLC<br>5608 Parkcrest Dr. Suite 200<br>Austin, Texas 78731<br>edavenport@rcmhlaw.com<br>jbyington@rcmhlaw.com |
| Martha Mahan, as the Representative of the Estate of Mary Rivera, Appellee | Jack Modesett, III<br>Walter V. Williams<br>ModesettWilliams, PLLC<br>515 Congress Ave.,<br>Suite 1650<br>Austin, Texas 78701<br>jack@modesettlaw.com<br>walter@modwill.com | Jack Modesett, III<br>Walter V. Williams<br>ModesettWilliams, PLLC<br>515 Congress Ave.,<br>Suite 1650<br>Austin, Texas 78701<br>jack@modesettlaw.com<br>walter@modwill.com |

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL......................................................i

TABLE OF CONTENTS .........................................................................ii

TABLE OF AUTHORITIES..................................................................iv

ABBREVIATIONS OF RECORD REFERENCES...........................................vi

APPENDIX .........................................................................................vii

STATEMENT OF THE CASE...................................................................viii

COURSE OF PROCEEDINGS AND DISPOSITION ...................................viii

STATEMENT REGARDING ORAL ARGUMENT......................................... 1

STATEMENT OF JURISDICTION ......................................................... 1

ISSUES PRESENTED ......................................................................... 1

STATEMENT OF FACTS ..................................................................... 2

SUMMARY OF ARGUMENT ................................................................. 4

ARGUMENT AND AUTHORITIES......................................................... 5

    I.      STANDARD OF REVIEW................................................................. 5

    II.     DR. LIPSON IS QUALIFIED.............................................................. 5

          A.  Summary of Dr. Lipson's Qualifications............................... 6

          B.  Dr. Lipson is Qualified to Offer Causation Opinion ............. 9

          C.  Dr. Lipson is Qualified to Offer Opinions on
              Standard of Care and Breach.............................................. 18

III.   THE REPORT IS A GOOD FAITH EFFORT
       TO COMPLY WITH CHAPTER 74.................................................. 21

       A.   Summary of Dr. Lipson's Report........................................ 21

       B.   The Report is Sufficient as to Breach and Causation ......... 28

CONCLUSION AND PRAYER .................................................................... 32

CERTIFICATE OF SERVICE ..................................................................... 33

CERTIFICATE OF COMPLIANCE ............................................................. 34

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Am. Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873
(Tex. 2001) ................................................................5, 14, 21, 32

*Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48 (Tex. 2002)................................. 5

*Broders v. Heise,* 924 S.W.2d 148 (Tex. 1996) ...................... 16

*Christus Health Se. Texas v. Broussard,* 267 S.W.3d 531
(Tex. App.—Beaumont 2008, no pet.) ................................... 19

*Christus Spohn Health Sys. Corp. v. Sanchez,* 299 S.W.3d 868
(Tex. App.—Corpus Christi 2009, pet. denied) .................................. 29

*Cortez v. Tomas,* 02-11-00231-CV, 2012 WL 407382,
(Tex. App.—Fort Worth Feb. 9, 2012, no pet.) .................................15, 16

*Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842 (Tex. 2005) ................ 13

*Hendrick Med. Ctr. v. Texas Podiatric Med. Ass'n,* 392 S.W.3d 294
(Tex. App.—Eastland 2012, no pet.) ................................................ 5

*See IHS Acquisition No. 140, Inc. v. Travis,*
No. 13-07-481-CV, 2008 WL 1822780 (Tex. App.—Corpus Christi
Apr. 24, 2008, pet. denied) (mem.op.) (not designated for publication) ............... 20

*Jelinek v. Casas,* 328 S.W.3d 526 (Tex. 2010) ...................... 31

*Leland v. Brandal,* 257 S.W.3d 204 (Tex. 2008)................................. 33

*Loaisiga v. Cerda,* 379 S.W.3d 248 (Tex. 2012) ...................... 15

*Nacogdoches County Hosp. Dist. v. Felmet,* 12-12-00393-CV, 2013 WL 6207838,
(Tex. App.—Tyler Nov. 26, 2013, no pet.) ......................................... 19

*Nexion Health at Garland, Inc. v. Treybig,*
05-14-00498-CV, 2014 WL 7499373 (Tex. App.—Dallas

Dec. 31, 2014, no pet.) .................................................................................. 19

*Pediatrix Med. Servs. Inc. v. De La O,* 368 S.W.3d 34
(Tex.App.—El Paso 2012, no pet.) ................................................................ 16

*Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404
(Tex. App.—Fort Worth 2003, no pet.) ......................................................... 20

*Scoresby v. Santillan,* 346 S.W.3d 546 (Tex. 2011) ............................... 21, 32

*Shelton v. Sargent,* 144 S.W.3d 113
(Tex. App.—Fort Worth 2004, pet. denied) ................................................... 20

*Tenet Hosps. Ltd. v. Love,* 347 S.W.3d 743
(Tex. App.—El Paso 2011, no pet.) .......................................................... 12, 19

*UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.,* 281 S.W.3d 207
(Tex. App.—Dallas 2009, pet. denied) ................................................ 10,12, 30

## STATUTES

TEX. CIV. PRAC. & REM. CODE § 74.351 ..............3, 4, 5, 6, 15, 17, 21, 29, 32

TEX. CIV. PRAC. & REM. CODE § 74.351(l) ............................................ 21, 32

TEX. CIV. PRAC. & REM. CODE § 74.402 ................................................ 5, 6, 15

TEX. CIV. PRAC. & REM. CODE § 74.403 ............................................ 5, 6, 13, 15

TEX. R. EVID. 702 .......................................................................................... 13

TEX. R. EVID. 703 ............................................................................... 13, 14, 30

# ABBREVIATIONS AND RECORD REFERENCES

Abbreviations:

Appellee will be referred to as "Appellee", "Mahan" or "Ms. Rivera."

Appellant, Gracy Woods I Nursing Home will be referred to as "Appellant" or "Gracy Woods."

Record References:

References to the Clerk's Record are in the form of "CR__."

References to the Clerk's Supplemental Record are in the form of "Supp. CR__."

References to the Reporter's Record are in the form of "RR__."

References to the Appendix items attached to the Brief are in the form of "App.___."

# APPENDIX

Report of Loren Lipson, M.D. with exhibits[1] ......................................... Appendix 1

---

[1] Appellant's Appendix 5, "Report of Loren Lipson, M.D." does not contain all of Dr. Lipson's referenced exhibits.

## STATEMENT OF THE CASE

Appellee is satisfied with Appellant's statement of the case. Tex. R. App. P. 38.2(a)(1)(B).

## COURSE OF THE PROCEEDINGS AND DISPOSITION

Appellee is satisfied with Appellant's Course of Proceedings. Tex. R. App. P. 38.2(a)(1)(B).

## NO. 03-15-00596-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

GRACY WOODS I NURSING HOME

*APPELLANT*

v.

MARTHA MAHAN, AS THE REPRESENTATIVE
OF THE ESTATE OF MARY RIVERA

*APPELLEE*

ON INTERLOCUTORY APPEAL FROM
THE 250TH JUDICIAL DISTRICT, TRAVIS COUNTY, TEXAS

**APPELLEE'S BRIEF**

Jack Modesett, III
Texas Bar No. 14244337
Walter V. Williams
Texas Bar No. 21584800
**MODESETTWILLIAMS, PLLC**
515 Congress Avenue, Suite 1650
Austin, Texas 78701
512-472-6097 – Telephone
512-481-0130 – Telecopier
jack@modesettlaw.com
**ATTORNEYS FOR APPELLEE**

**ORAL ARGUMENT REQUESTED**

## STATEMENT REGARDING ORAL ARGUMENT

Appellee requests oral argument pursuant to TEX. R. APP. P. 39.1 and respectfully submits that oral argument would aid the Court in determining the legal and factual issues presented in this appeal.

## STATEMENT OF JURISDICTION

Appellee is satisfied with Appellant's Statement of Jurisdiction. Tex. R. App. P. 38.2(a)(1)(B).

## ISSUES PRESENTED

Appellee is satisfied with Appellant's statement of the Issues Presented. Tex. R. App. P. 38.2(a)(1)(B).

# STATEMENT OF FACTS

On November 8, 2013, 78 year-old demented Mary Rivera was sexually assaulted in her room, while a resident at Appellant's nursing home facility. (CR 17.) The rape occurred after regularly scheduled events at the nursing home during which alcohol was served. (CR 17.) Mrs. Rivera's daughter, Martha Mahan, had previously complained to the facility that younger male residents had behaved inappropriately towards Mrs. Rivera. Appellant took no action. (CR 17.)

Early in the morning of November 9, 2013, Mahan went to visit her mother in the nursing home. Mrs. Rivera was distressed. Mahan noted broken glass on the floor of her room. When she took her mother to the bathroom, Mrs. Rivera attempted to urinate standing up, which was unusual. Mahan also found a wad of bloody rags in Mrs. Rivera's trashcan. (CR 17-18.) Mahan showed this evidence to nursing home employees, who destroyed it. (CR 17-18.) Ultimately, Mrs. Rivera was taken to St. David's Medical Center where a Sexual Assault Nurse Examiner (SANE) performed a post-rape examination. (CR 18, 92, 100.) This SANE nurse found bruising to posterior fourchette and periurethral areas of Mrs. Rivera's vulva as well as bruising on her posterior vaginal wall. (CR 18, 94, 100.) According to the SANE nurse, this definitively indicated penetration of the female sexual organ. (CR 18, 94, 100.)

2

Mahan filed suit on December 11, 2014, alleging that Appellant failed to protect Mrs. Rivera from sexual assault. (CR 3.) Mahan served the report and curriculum vitae of Loren Lipson, M.D., on January 30, 2015, complying with the 120-day expert report deadline. Tex. Civ. Prac. & Rem. Code § 74.351. (CR 11.)

Appellant filed its Motion to Dismiss on August 12, 2015. (CR 301.) Mahan filed her response on August 24, 2015. (CR 376.) The Honorable Gisela Triana denied Appellant's Motion to Dismiss on September 1, 2015 (CR 446), and Appellant filed the present appeal.

## SUMMARY OF THE ARGUMENT

A smattering of citations to black letter law belie what Appellant's Brief really appears to be: a cut-and-paste boilerplate appeal of an adverse ruling on a Section 74.351 motion to dismiss. Appellant challenges the qualifications of an expert eminently qualified on nursing home healthcare, and argues that a detailed and comprehensive export report somehow fails to meet the "good faith" standard.

Appellant largely ignores both the level of detail of Dr. Lipson's report, as well as his unassailable CV. Dr. Lipson is the expert that the U.S. Department of Justice, U.S. Department of Health and Human Services, the Office of the Inspector General, and the states of Alaska, California, and New Mexico have turned to regarding geriatric medicine, elder abuse, and long term care of the elderly. He is quite possibly the most qualified expert in the country on these issues. His report details his background, the facts and documents that form the basis of his opinion, the applicable standard of care, specifically what Appellant should have done but failed to do, breach, causation, and the resulting injury. His report certainly meets the "good faith" standard, as the trial court correctly determined. The trial court's determination was not an abuse of discretion -- it was in no way "an arbitrary or unreasonable [act] without reference to any guiding rules or principles" -- and it should be affirmed.

4

## ARGUMENT AND AUTHORITIES

### I. STANDARD OF REVIEW

A trial court's order granting or denying a motion to dismiss filed under Section 74.351 of the Texas Civil Practices and Remedies Code is reviewed under an abuse of discretion standard. *Hendrick Med. Ctr. v. Texas Podiatric Med. Ass'n*, 392 S.W.3d 294, 296-97 (Tex. App.—Eastland 2012, no pet.); *Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 875, 877-78 (Tex. 2001). An abuse of discretion occurs if the court acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Wright*, 79 S.W.3d at 52. A court of appeals may not substitute its own judgment for the trial court's judgment. *Id.*

### II. DR. LIPSON IS QUALIFIED

Appellant complains that Dr. Lipson is not qualified under TEX. CIV. PRAC. & REM. CODE § 74.402 (be a healthcare provider or consultant in "same field" as a defendant, knowledge of the standard of care and qualified on basis of training or experience) and § 74.403 (i.e., be a physician and be otherwise qualified).

Dr. Lipson is a nationally prominent physician, professor, lecturer and consultant in geriatric medicine, abuse of the elderly and related topics. Dr. Lipson's qualifications are extensive; he may be the most qualified expert in the country and is the one the U.S. Department of Justice and the U.S. Department of

Health and Human Services retain when they need expertise in this area. He is qualified under both TEX. CIV. PRAC. & REM. CODE §74.402 and §74.403.

## A. SUMMARY OF DR. LIPSON'S QUALIFICATIONS

### 1. Educational Background in Geriatric Medicine

Dr. Lipson is a graduate of UCLA and The John Hopkins University School of Medicine. (See Dr. Lipson's CV, CR 24-67[1]). Dr. Lipson did his internship and residency at The John Hopkins Hospital. Dr. Lipson has fellowships from Harvard **(Geriatric Medicine)**, Beth Israel Hospital (Gerontology), Brigham-Women's Hospital (Gerontology), Hebrew Rehabilitation Center (Geriatric Medicine) and John Hopkins (Clinical Fellow) among others. *Id.*

### 2. Certification in Geriatric Medicine

He is boarded in Internal Medicine and Quality Assurance and Utilization Review and holds a **Certificate of Expertise in Geriatric Medicine** from the American Board of Internal Medicine. Quality assurance is the study and implementation of improvements to care provided, in Dr. Lipson's case, for the elder population in both the nursing home and hospital setting. *Id.*

### 3. Twenty-Seven Academic Appointments in Geriatric Medicine

Dr. Lipson has received twenty-seven academic appointments to include John Hopkins, Harvard Medical School (Scholar Geriatric Medicine),

---

[1] Appendix 1 to Appellee's Brief.

6

Massachusetts General Hospital, USC (Associate Professor-Geriatric Medicine), USC (Chief-Division of Geriatric Medicine), Brigham-Women's Hospital (Geriatric Medicine), Beth Israel (Geriatric Medicine), USC (Gerontology Research Institute) and University of Alaska (Geriatrics). His teaching responsibilities include USC-Fellowship Program-Geriatric Medicine, USC-Development and Improvement of Geriatric Medical Curriculum, USC-Steering Committee-Pacific Geriatric Education Center, and USC-Ethel Percy Andrus Gerontology-Director and lecturer. His teaching responsibilities at the University of Alaska also include Director-Care of Elderly, Co-Director in Geriatric Education and Faculty Consultant to Geriatric residents. *Id.*

### 4. Geriatric Administrative Positions, Including Directorships

Dr. Lipson has further served in numerous administrative positions to include **Chief of Division Geriatric Medicine**, Senior Staff Physician–Geriatric Programs, Director of the USC Ambulatory Health Center Japanese Retirement Homes, Director–Geriatric Medicine VA Clinic, Director of USC Teaching Nursing Home Program, Director of Senior Cancer Center, Director of Senior Care Program–USC, Co-Director–Adult Protective Team–Geriatric Medicine Program–LAC/USC, Medical Director–Alaska Geriatric Education Center and Medical Director National Resource Center for Studies in Native American, Alaskans and Hawaiian Elders, University of Alaska. *Id.*

7

<u>5.</u>    <u>Geriatric Consultancies: Boards, Program Development</u>

His public service includes **Consultant–Geriatric** Medicine–State of Alaska, Board of Directors, California Association of Medical Directors, and Task Force on Elder Abuse, City of Los Angeles. *Id.*

Dr. Lipson's consultancies include Geriatric Medicine-Silverado Senior Living Centers, Geriatric Medicine-Glendale Adventist Medical Center, Geriatric Program Development-Bay Shores Medical Group, Geriatric Program Development–San Dimas Community Hospital, Geriatric Program Development and Long Term Care-The Motion Picture & Television Home, Long Term & Geriatric Medicine– State of California, **Elder Abuse & Geriatric Medicine** – State of California, Office of the Attorney General, **Long Term Care, Elder Abuse and Geriatric Medicine**–State of California–Office of the Attorney General – Medicaid Fraud, **Geriatric Medicine and Elder Abuse**–State of New Mexico, **Geriatric Medicine and Elder Abuse**–United States of America–Department of Justice, and Long Term Care, **Geriatric Medicine and Elder Abuse**–United States of America–Department of Health and Human Services–Office of the Inspector General. *Id.*

<u>6.</u>    <u>Lectures on Elder Abuse: Washington U; Harvard; Stanford; Yale; Brown; Baylor, etc.</u>

Dr. Lipson has lectured all over the country on issues involving **geriatrics, long term care, and elder abuse**. The lectures include Washington University,

8

Harvard, Yale, the University of New Brunswick, the University of Florida, Stanford, University of Pittsburgh, University of Hawaii, University of California San Francisco, Brown, University of Nevada, University of Guam, Kansas University, Baylor, Chicago Medical College, University of Oklahoma, University of Colorado, University of Kentucky, University of Utah, Southern Illinois Medical School, Allegheny Medical School, University of Arizona as well as many others. *Id.*

Dr. Lipson has published numerous peer-reviewed articles, book chapters and monograms dealing with the care of the elderly. *Id.*

## B. DR. LIPSON IS QUALIFIED TO OFFER CAUSATION OPINION

### 1. Dr. Lipson Does Not Need to "Diagnose" the Sexual Assault

Mrs. Rivera's daughter found her crying and confused, in pain, with a pile of bloodied tissues in the trashcan and broken Christmas decorations on the floor of her room. (CR 73-74.) Ms. Mahan noticed her mother appeared to be in pain and urinated while standing up, which was very unusual, and ultimately took her to St. David's Hospital. (CR 74.) Mrs. Rivera was examined by a Sexual Assault Nurse Examiner (SANE nurse), who found specific evidence of vaginal trauma; she had bruising to both the front of the vagina as well as the posterior of the vaginal wall. (CR 98, 100.) The SANE nurse concluded that her exam "definitively indicate[s]

penetration of the female sexual organ." (CR 100.) She recommended that Mrs. Rivera have an HIV and other STD tests conducted. (CR 78.)

Appellant strangely treats sexual assault as a disease to be diagnosed and treated. Appellant argues that Dr. Lipson is not qualified to issue opinions about whether Mrs. Rivera was sexually assaulted because his report does not show "that he has ever examined a patient for sexual assault, diagnosed a patient with sexual assault, or treated a patient for sexual assault." (Appellant's Br. at 12.)

In a health care liability case resulting from a patient's sexual assault by another patient while under the defendant's care, there is no requirement that the expert opine that the victim was sexually assaulted. *UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.,* 281 S.W.3d 207, 211-13 (Tex. App.—Dallas 2009, pet. denied). In *UHS of Timberlawn, Inc.,* the Dallas Court of Appeals rejected the identical argument Appellant makes – nearly verbatim – here.

> Timberlawn asserts Levine's revised report and curriculum vitae do not establish he is qualified to render an opinion as to causation, and the revised report is inadequate and conclusory as to that issue. These arguments all flow from Timberlawn's position disputing whether S.B. was, in fact, raped.
>
> Timberlawn contends that, absent a statement in Levine's revised report (presumably based on all reasonable medical probability) that S.B. was in fact raped, Levine's revised report fails to identify the "causal relationship between [Timberlawn's actions] and the injury, harm, or damages claimed." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). Timberlawn argues Levine did not opine, nor did he show he was qualified to opine, as to

whether S.B. had been raped. Timberlawn's arguments are best summarized in the conclusion and prayer set forth in its brief:

> [Levine] did not and/or could not express an opinion, based on his education, training or experience, that [S.B.] was sexually assaulted or raped. [S.B.'s] expert did not nor could not articulate facts to support any opinion that [Timberlawn's] alleged breaches in the standard of care proximately caused [S.B.'s] alleged sexual assault or rape. [S.B.'s] expert has not shown himself to be qualified to render an opinion that [S.B.] was sexually assaulted or raped or that the alleged breaches in the standard of care proximately caused [S.B.'s] sexual assault or rape.

Thus, the premise of Timberlawn's arguments is that unless S.B. can present the report of a qualified expert opining that S.B. was actually raped, her expert report(s) cannot identify the alleged causal relationship between Timberlawn's actions or omissions and S.B.'s alleged injuries, as required by section 74.351(r)(6). We reject this premise.

In some healthcare liability claims, the "injury, harm, or damages claimed" flow from the existence of a medical condition that itself resulted from the breach of the applicable standard of care. In such cases, identifying the causal relationship between the alleged breach of the standard of care and the resulting harm involves not only an explanation as to how the standard of care was breached, but also how the breach gave rise to the new, deleterious medical condition. Similarly, other healthcare liability claims may allege that a breach of the applicable standard of care exacerbated a pre-existing medical condition, or hindered or prevented the effective treatment of such a condition. Identifying the "breach/injury" causal relationship in these cases may well require an expert to opine as to the existence, extent, and prognosis of the pre-existing medical condition, as well as how the alleged breach of the standard of care aggravated such a condition, impeded or prohibited its treatment, and otherwise affected the patient's prognosis.

However, S.B.'s claim is different. S.B. alleges that, as a result of Timberlawn's failure to meet the applicable standards of care

11

relevant to its treatment of her, she was raped. ***Rape is not a medical condition. It is an assault.*** Moreover, rape may—or may not—be accompanied by medically ascertainable evidence of physical trauma, or even physical evidence that it occurred.

Medical evidence of an alleged sexual assault is not required even in criminal prosecutions; the rule in Texas is that "penetration may be proven by circumstantial evidence." *See Villalon v. State,* 791 S.W.2d 130, 133 (Tex.Crim.App.1990). ...

***We decline to hold that in order to identify the causal relationship between Timberlawn's actions and S.B.'s claimed injury,*** *see* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6), ***she was required to proffer an expert report opining that she was in fact raped.*** Thus we reject Timberlawn's arguments that the trial court erred in not dismissing S.B.'s claim because: (1) Levine's report did not show him to be qualified to render an opinion on whether S.B. was in fact raped; and (2) because Levine's report did not render an opinion on that issue.

*UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.,* 281 S.W.3d 207, 211-13 (Tex. App.—Dallas 2009, pet. denied) (emphasis added).

Sexual assault is not a disease, and this is a case about negligence in nursing home health care, not gynecology; Mrs. Rivera was injured as a result of Appellant's multiple failures in protecting her from sexual assault. The Court's inquiry should focus on whether the expert has the "knowledge, skill, experience, training or education regarding the specific issue before the Court which would qualify the expert to opine on a particular subject." *Tenet Hosp. Ltd. v. Love,* 347 S.W.3d 743, 749-50 (Tex. App. – El Paso 2011, no pet.) The specific issue before the court is the nursing home's breach of its duty to protect its patient from sexual assault, despite being put on notice of a prior sexual assault and inappropriate

12

behavior towards Mrs. Rivera by males at the facility. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 850 (Tex. 2005) (involving sexual assault by another resident; nursing home is obligated to protect "the patient population from harming themselves and each other").

### 2. Dr. Lipson Properly Relies on the Medical Records and Examination by Sexual Assault Nurse Examiner

Appellant argues that Dr. Lipson is not qualified to offer causation opinions under TEX. CIV. PRAC. & REM. CODE § 74.403(a). Under Section 74.403(a), "a person may qualify as an expert witness on the issue of causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." Dr. Lipson is a physician. CR 15.[2] He is also qualified to render opinions on that causal relationship under the Texas Rules of Evidence.[3]

Appellant suggests that Dr. Lipson may not rely upon the SANE nurse report or the medical records in determining that Mrs. Rivera was sexually assaulted. But Dr. Lipson properly relies on medical records available to him. The assault has been copiously documented by the SANE nurse and a doctor and reviewed by Dr.

---

[2] Appendix 1 to Appellee's Brief.

[3] *See generally* Tex. R. Evid. 702 (a qualified witness may testify in the form of an opinion if it will help the trier of fact to understand the evidence or to determine a fact in issue) and 703 (an expert may base an opinion on facts or data that the expert has been made aware of, reviewed, or personally observed).

13

Lipson. (See CR 78-100.) The SANE nurse found bruising to both the front of the vagina as well as the posterior of the vaginal wall. (CR 98, 100.) The nurse stated that the findings "definitively indicate penetration of the female sexual organ." (CR 100.) In arguing that Dr. Lipson is unqualified, Appellant does not even mention the SANE nurse report or her declaration.

Appellant's argument that Dr. Lipson cannot rely on the SANE examination or other medical records ignores TEX. R. EVID. 703 and strains credulity. It is like saying a surgeon could not rely on a radiologist's reading of an MRI to provide the opinion that a patient had a brain tumor. Experts can undoubtedly rely on medical records (and even hearsay) in formulating an expert report. *See* TEX. R. EVID. 703 (expert may base opinion on facts or data that the expert has been made aware of, reviewed, or personally observed, including facts or data that would not normally be admissible so long as experts in that field would reasonably rely on those kinds of facts or data). As the court noted in *Palacios*,

> [A] plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *See, e.g.,* Tex. R. Civ. P. 166(f) (setting out the requirements for the form and content of affidavits offered as summary-judgment proof); Tex.R. Evid. 802 (stating that most hearsay is inadmissible).

46 S.W.3d at 879.

14

Expert witnesses must be able to rely upon the medical records to render opinion. Expert witnesses may rely on witness statements. If one follows Appellant's argument to its logical conclusion, experts could not rely on the nursing home chart (made mostly by nurses), the medical records (made by nurses and treating doctors whose resumes are not available). This is not the law in Texas.

A reading of the statute and the relevant case law make it clear that the limitations of § 74.402 and § 74.403 do not apply to the underlying information reviewed by experts, such as the medical records or SANE nurse examination. Indeed, the Texas Supreme Court has expressly stated that expert reports would likely be inadequate if they did not look at the medical records. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012) (involving the sexual assault of patients). The Supreme Court also held in the same case that experts could rely upon the pleadings on file in the case to render expert opinions. *Id.* Even a case relied on by Appellant's notes that "section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history." *Cortez v. Tomas*, 02-11-00231-CV, 2012 WL 407382, at \*2 (Tex. App.—Fort Worth Feb. 9, 2012, no pet.) Dr. Lipson may properly rely on the SANE nurse examination and other medical records in reaching his conclusions.

### 3. The Cases Appellant Relies On Are Distinguishable

15

*Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996); *Cortez v. Tomas, supra;* and *Pediatrix Med. Servs. Inc. v. De La O,* 368 S.W.3d 34 (Tex.App.—El Paso 2012, no pet.), on which Appellant relies, are distinguishable. In those cases, simply put, the expert at issue did not have experience in the area of health care at issue. For example, in *Broders*, a hospital and physicians were sued after allegedly failing to diagnose head trauma, resulting in death. In affirming the trial court's evidentiary ruling, the Texas Supreme Court noted that there was no evidence that Plaintiff's expert, while a physician, had experience or knowledge about the effectiveness of treatments for head trauma. *Id.* at 153.

In contrast to *Broders* and the other cases Appellant cites, Dr. Lipson is highly qualified in the precise area of health care at issue. Based on his knowledge and experience, he is qualified to testify that Appellant should have been able to prevent Mrs. Rivera's sexual assault. He has taught future nursing home directors at multiple Tier 1 universities and governmental entities. In his CV there are at least 9 references to lectures, courses and papers relating to "Elder Abuse." There are over 30 references to geriatrics, including fellowships at Harvard. There are multiple references to his directorships over programs and facilities involving care for the elderly. His experience includes consulting at nursing homes and governmental entities on the operation of nursing homes. He is familiar with treatment of patients like Mrs. Rivera and familiar with the training of employees

16

providing care to residents like Mrs. Rivera. He is board certified in Quality Assurance. Dr. Lipson has spent many years learning, lecturing, writing, and testifying on nursing home abuse issues. (See Dr. Lipson's Dec. and CV, CR 15-67.)

### 4. The Degree of Appellant's Negligence Does Not Protect It From Liability

Appellant argues that Dr. Lipson's inability to identify the attacker or the precise time Mrs. Rivera was attacked means that he is unqualified. (See Appellant's Br., 21-22.) Appellant's position is that Mrs. Rivera's suit cannot go forward because the attacker was not apprehended. The reason the attacker was able to sexually assault Mrs. Rivera in the first place, and the reason he was not apprehended, was because Appellant did not timely check on Mrs. Rivera in her room, adequately patrol the halls, or have Mrs. Rivera moved to a more observable location. Appellant treats its own negligence as a defense; it essentially argues that it cannot be held liable because its failure to monitor and protect Mrs. Rivera was so egregious that that attacker cannot be identified and the precise time of the assault cannot be determined. Sticking one's head in the sand cannot be a defense. Further, if anyone had superior access to this information, it was Appellant, whose agents destroyed the bloody rags, evidence of a crime, when given the opportunity.

To meet the requirements of Section 74.351, Dr. Lipson does not have to be omnipotent. He does not have to succeed where the Austin Police Department

failed by identifying the attacker and sleuthing out other details of the assault. Those details are irrelevant to the cause of action being asserted. No jury is going to be asked to identify the rapist was or determine precisely when the rape occurred. The relevant issues addressed by Dr. Lipson are: what do the records say about Mrs. Rivera's assault; what is the standard of care with respect to the assault; did Appellant breach the standard of care concerning the assault; and, was Mrs. Rivera injured as a result of that breach. In short, should this nursing home have prevented Mrs. Rivera's sexual assault? Dr. Lipson is well qualified to render those opinions.

## C. DR. LIPSON IS QUALIFIED TO OFFER OPINIONS ON STANDARD OF CARE AND BREACH

In what appears to be a copy-and-paste job of other appeals Appellant has likely filed in similar cases, Appellant argues that Dr. Lipson is not qualified to opine on the standard of care for nursing homes, or breach of such standard of care. Appellant appears to have overlooked the pages and pages of Dr. Lipson's CV setting out his experience, described in this brief *supra*. Dr. Lipson is well qualified to opine on nursing home elder abuse. He is, in fact, perhaps the most qualified person in the country to opine on this subject. The trial court acted within its discretion in concluding that Dr. Lipson is qualified to render his opinions on the standard of care and breach at issue in this case.

18

*Nexion Health at Garland, Inc. v. Treybig*, 05-14-00498-CV, 2014 WL 7499373 (Tex. App.—Dallas Dec. 31, 2014, no pet.) and other cases Appellant relies on are distinguishable. Dr. Lipson has the breadth and depth of knowledge, training, and experience specifically relevant to this case that separates him from the experts in *Nexion* and Appellant's other cases. *See Nexion*, 2014 WL 7499373, at *6 (expert lacked experience regarding physical therapy treatment and was disqualified in case involving spinal injury during physical therapy); *Nacogdoches County Hosp. Dist. v. Felmet*, 12-12-00393-CV, 2013 WL 6207838, at *3 (Tex. App.—Tyler Nov. 26, 2013, no pet.) (in claim against hospital for failing to accommodate physician's request for an operating room in a timely manner, physician who lacked experience in hospital administration protocols and scheduling surgeries was not qualified); *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 747 (Tex. App.—El Paso 2011, no pet.) (experts who lacked knowledge, training, or experience concern hospital's staffing of certain specialists or transfer policies not qualified in case alleging hospital did not have necessary physicians on staff or make timely transfer arrangements for patient); *Christus Health Se. Texas v. Broussard*, 267 S.W.3d 531, 535 (Tex. App.—Beaumont 2008, no pet.) (neurologist who was not familiar with the standard of care of internal medicine physician and not familiar with hospital administration not qualified in case against internal medicine physician and hospital in case involving patient with pneumonia

19

and acute respiratory deficiency); *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 411 (Tex. App.—Fort Worth 2003, no pet.) (ER physician and neurologist not qualified to testify about hospital policies and procedures governing administration of a treatment protocol for stroke patients where lacked knowledge, training, or experience with such treatment protocol); *Shelton v. Sargent*, 144 S.W.3d 113, 125 (Tex. App.—Fort Worth 2004, pet. denied) (surgical oncologist not qualified to testify in case against radiologist where she lacked expertise or training in radiology).

In contrast to these cases, Dr. Lipson's report and CV demonstrate his knowledge, training and experience on issues relevant to this dispute. Dr. Lipson has lectured to nursing home directors on the issues of geriatrics and elder abuse, he has inspected geriatric facilities, and he is the expert the Department of Justice, Department of Health and Human Services, and other governmental bodies consult with on these issues. He is well qualified to testify as to the standard of care and breach. *See IHS Acquisition No. 140, Inc. v. Travis*, No. 13-07-481-CV, 2008 WL 1822780, at *5 (Tex.App.—Corpus Christi Apr. 24, 2008, pet. denied) (mem.op.) (not designated for publication) (doctor who was board certified in geriatrics and served as a professor of geriatric medicine was qualified to testify to the standard of care applicable in a claim against a nursing home for failure to monitor a resident's eye injury).

20

## III. THE REPORT IS A GOOD FAITH EFFORT TO COMPLY WITH CHAPTER 74

Appellant also complains that Dr. Lipson's report does not provide it adequate notice ("good faith effort") under TEX. CIV. PRAC. & REM. CODE §74.351(l). To qualify as a good faith effort, it must inform the defendant of the conduct called into question and provide a basis for the trial court to conclude the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). The Supreme Court's position on expert reports is well described.

> The expert report must represent only a good faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute.

*Am. Transitional Care Centers of Texas, Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex. 2001). A "fair summary" is "something less than a full statement of the applicable standard of care and how it was breached," it merely "sets out what care was expected, but not given." *Id.* at 880. Dr. Lipson's detailed report exceeds this standard.

### A. SUMMARY DR. LIPSON'S REPORT

#### 1. Dr. Lipson's Review of Pertinent Medical and Other Records

Dr. Lipson's report sets out in detail the information he reviewed in order to render his opinions. They include:

a. The statement of the daughter Martha Mahan;

21

b.    The Gracy Woods nursing home records;

c.    The SANE nurse report;

d.    The SANE nurse statement;

e.    The St. David's Hospital records;

f.    The guardianship records regarding Ms. Rivera; and

g.    The Texas Department of Aging and Disability Services Report. (CR 16.)

### 2.    Dr. Lipson Sets Out Facts Leading to Rivera's Rape

Dr. Lipson analyzes the facts leading up to the rape of Mrs. Rivera. Dr. Lipson notes that several months before Mrs. Rivera's incident another complaint of sexual assault was made in the same facility. He opines this should place the facility on heightened alert for this type of problem. (CR 16-21.)

Dr. Lipson reviews the citations issued by the State against the nursing home including the failure to implement written policies and the failure to report the prior incident to the proper law enforcement authorities. (CR 16.)

Dr. Lipson then reviews the guardianship records of Mrs. Rivera, which place her under the guardianship of her daughter, Martha Mahan. Judge Herman, based on medical exams, found Mrs. Rivera was a "totally incapacitated person without capacity to care for herself." Dr. Lipson opines this finding is consistent with the records from the nursing home. (CR 16-17.)

22

### 3. Dr. Lipson Carefully Reviews Nursing Home Chart and Ms. Mahan's Statement

Dr. Lipson then conducts a careful review of the nursing home chart to establish the fact that Mrs. Rivera had very poor short and long term memory problems and often did not remember people or where her room was. Dr. Lipson goes on to opine that due to her significant mental limitations, Mrs. Rivera required careful monitoring by the staff. (CR 17.)

Dr. Lipson then reviews the statement of Martha Mahan, Mrs. Rivera's daughter and guardian. Ms. Mahan's statement discussed parties on Friday afternoons where alcohol is served to the residents. Ms. Mahan reports that certain male residents acted inappropriately towards Mrs. Rivera and that this fact was reported to the management. (CR 17.)

Dr. Lipson then reviews the facts surrounding the discovery of the broken glass, bloody rags and distressed Mrs. Rivera. He then notes that an external head to toe exam was done on Mrs. Rivera which found no exterior wounds. No vaginal exam was done. (CR 17-18.)

Dr. Lipson then discusses the calling of the police and the examination done at St. David's Hospital by SANE nurse Jenny Black. Dr. Lipson notes the injuries to both the posterior and anterior portions of the vagina. He further reviewed the statement of the SANE nurse indicating definitive "penetration of the female sexual organ". (CR 18.)

23

### 4. Dr. Lipson Reviews Literature on Sexual Assaults in Texas

Dr. Lipson then cites literature for the disturbing fact that in the four years leading up to Mrs. Rivera's assault nearly 400 sexual assaults were reported in Texas nursing homes. Dr. Lipson further relates the fact that those who suffer from dementia are at particularly high risk for this type of abuse as they are very poor historians. (CR 18.)

Dr. Lipson then goes on to discuss how these assaults can be prevented. He notes that these facilities all provide 24-hour skilled nursing care as required by law. This means the facility must have skilled nurses as well as certified nursing aides on staff twenty-four hours a day three hundred and sixty-five days a year. (CR 18-19.)

Dr. Lipson goes on to review the literature and reports that most of these assaults occur at night and if a facility has a history of reported assaults they are at a greater risk for additional incidents. He then reviews the history of reported assault, non-compliance and management awareness of these issues. Dr. Lipson reviews the general knowledge within the industry of these assaults and the press coverage regularly offered this issue. (CR 19.)

### 5. Dr. Lipson – Rivera's Injury Foreseeable and Defendant Owed Duty to Rivera

He then opines that with the significant number of assaults in Texas nursing homes, the recent history of reported assault in Defendant's facility, and the

24

complaints of the daughter Martha Mahan, that it is foreseeable assaults would occur if precautions are not taken. He then opines a nursing home owes a duty of protection to patients suffering from mental incapacity. He then writes that such patients require enhanced supervision and additional staff time to protect them from others. This is particularly true, he states, in a facility with a history of reported assault and a history of family complaints of inappropriate behavior towards Mrs. Rivera. (CR 19.)

### 6. Dr. Lipson Sets Out Standard of Care

After pages of detail concerning the facts, the records and the foreseeability, Dr. Lipson then sets out the standard of care:

> The standard of care requires the nursing home provide twenty-four hour a day skilled nursing care. The practical result of this requirement is that the staff must be moving through the halls and the rooms of the residents all night long. There should never be a time when a staff member is not in the next room or moving through the halls next to a resident's room.
>
> The standard of care requires that following the report of an assault at a nursing facility that the facility control unsupervised access to the rooms of residents at risk. The standard of care requires the facility take note of the families' concerns of inappropriate behavior and eliminate access to the patient by unsupervised males. Residents at risk include women with significant dementia such as Ms. Rivera. In light of the family's expressed concern of inappropriate advances to Ms. Rivera, the standard requires heightened scrutiny to include regular walks through the entire hall at intervals not to exceed ten minutes to prevent access to her room by males. The standard of care requires the nursing staff document the fact that it is performing the regular checks in the patients' charts.

25

In addition, the standard of care requires Ms. Rivera be moved to a room in close proximity to the nursing station following complaints of inappropriate contact with Mrs. Rivera.

(CR 20.)

### 7. Dr. Lipson Identifies Breaches of Standard of Care

Dr. Lipson then set out the breaches of the standard of care.

The facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera.

The facility breached the standard of care by not preventing access to her room by unsupervised males. The records do not indicate any checks on Ms. Rivera the night she was assaulted. The facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room.

(CR 20.)

### 8. Dr. Lipson Identifies the Harm to Mrs. Rivera

Dr. Lipson then sets out the harm caused. The harm caused Mrs. Rivera is significant. She was sexually assaulted. The injuries to her vagina are well documented in the SANE nurse report and above. The daughter reports she was tearful and afraid. This is a common response in sexual assault victims. The daughter reports this behavior of fear continued even after Mrs. Rivera was removed from the facility. The fact she suffered from dementia does not lessen the harmful mental effects of sexual assault. Even an animal can remember when it

26

has been abused. In many ways Mrs. Rivera was like a small child – confused and afraid as a result of this sexual assault. The history of problems together with the decision to ignore the families' complaints and eliminate unsupervised males from Mrs. Rivera's room indicates a conscious disregard for the well-being of Mrs. Rivera by the facility's management. (CR 20-21.)

9.      Dr. Lipson Eliminates Other Causes of Injury

Dr. Lipson then considers other potential causes of this injury. He considers whether the injuries may be self-inflicted, but discards this idea after a chart review found no indications of sexual self-stimulation or self-abuse. He further considered whether the family might have caused these injuries but again discards this idea after a chart review indicates the family was nothing but supportive. Dr. Lipson further notes Mrs. Rivera was in the nursing home at all relevant times and there was no indication she was assaulted on the way to the hospital to check to see if she had been sexually assaulted. (CR 21.)

In short, Dr. Lipson explains the background facts, his review of the medical and factual history, explains the problem with sexual assaults in nursing homes, explains the standard of care, the breaches of the standard of care as well as the harm caused. His report explains the Defendant's conduct called into question and provides detailed information for the trial court to determine the claims have merit.

27

## B.  THE REPORT IS SUFFICIENT AS TO BREACH AND CAUSATION

Appellant argues Dr. Lipson's report is deficient as to breach and causation. Appellant attempts to put requirements on Dr. Lipson's report that exceed those required under the Civil Practices and Remedies Code, and ignores what is actually stated in his report. Appellant's assertions that the report is insufficient in this way or that way fall apart under examination.

Dr. Lipson expressly details the breach of the standard of care in his declaration. *See* CR 20, quoted *supra*. Dr. Lipson states in his report:

> The standard of care requires the nursing home provide twenty-four hour a day skilled nursing care. The practical result of this requirement is that the staff must be moving through the halls and the rooms of the residents all night long. There should never be a time when a staff member is not in the next room or moving through the halls next to a resident's room.
>
> The standard of care requires that following the report of an assault at a nursing facility that the facility control unsupervised access to the rooms of residents at risk. The standard of care requires the facility take note of the families' concerns of inappropriate behavior and eliminate access to the patient by unsupervised males. Residents at risk include women with significant dementia such as Ms. Rivera. In light of the family's expressed concern of inappropriate advances to Ms. Rivera, the standard requires heightened scrutiny to include regular walks through the entire hall at intervals not to exceed ten minutes to prevent access to her room by males. The standard of care requires the nursing staff document the fact that it is performing the regular checks in the patients' charts. In addition, the standard of care requires Ms. Rivera be moved to a room in close proximity to the nursing station following complaints of inappropriate contact with Ms. Rivera.

28

The facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera.

The facility breached the standard of care by not preventing access to her room by unsupervised males. The records do not indicate any checks on Ms. Rivera the night she was assaulted. The facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room.

(CR 20.) Dr. Lipson thoroughly and in specific terms describes what tasks the standard of care requires and how Appellant failed to perform those tasks. Similar statements were found to be sufficient in another case involving an assault on a patient (this one committed by the staff):

Moreover, we conclude that [the expert] identified the care that was expected but not rendered under the applicable standard of care. She states that Spohn–Shoreline "[f]ailed to provide adequate supervision to the CNA [DeJesus] and the RN [Njoh]," "[f]ailed to protect Ms. Sanchez from sexual harassment and sexual abuse," and "[f]ailed to provide safety to Ms. Sanchez in her immediate post operative [sic] when the CNA lifted Ms. Sanchez up and began dancing with her." She explains the specific tasks and responsibilities required of Spohn–Shoreline and notes that it failed to perform as such.

*Christus Spohn Health Sys. Corp. v. Sanchez*, 299 S.W.3d 868, 877 (Tex. App.— Corpus Christi 2009, pet. denied). Dr. Lipson's description of specific failures of Appellant is more than sufficient to meet the good faith standard of Section 74.351.

Appellant argues that Dr. Lipson's report is conclusory as to whether sexual assault occurred. First, Appellant misstates the law when insisting that Appellee

29

offer an expert opinion that Rivera was sexually assaulted. *See UHS of Timberlawn, Inc.,* 281 S.W.3d at 211-13 (discussed *supra;* "Rape is not a medical condition. It is an assault. ... We decline to hold that [plaintiff] was required to proffer an export report opinion that she was in fact raped.") Second, Appellant ignores the well-documented medical records including the SANE nurse examination, Ms. Mahan's statement, and Mrs. Rivera's medical history (which prevents her from being able to consent to sexual activity). All of these facts are those upon which Dr. Lipson may rely in forming his opinion. TEX. R. EVID. 703.

Dr. Lipson opined that by not having skilled nursing staff present in the halls or in Mrs. Rivera's room, no staff was present to prevent the sexual assault. (CR 20.) Appellant failed to prevent access to her room by unsupervised males, failed to check on Mrs. Rivera the night she was assaulted, and failed to move her close to the nursing station where no unsupervised males could enter her room. *Id.* As a result, "The harm caused [to] Rivera [was] significant. She was sexually assaulted." *Id.* These statements, and others in Dr. Lipson's report, are sufficient as to breach and causation. *See, e.g., UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.,* 281 S.W.3d 207, 213 (Tex. App.—Dallas 2009, pet. denied) (in a case involving sexual assault by another patient, expert report met Section 74.351 requirements where expert opined that standard of care required facility to house victim where

she could not be accessed by unsupervised males and had facility housed her in a safe and appropriate manner, she would not have been victimized).

Finally, Appellant claims that Dr. Lipson failed to exclude "other, innocuous causes" for the vaginal bruising, bleeding, crying and confusion Mrs. Rivera displayed. Contrary to Appellant's assertion, Dr. Lipson did consider other causes for the injury and found no evidence to support them.[4] This case is thus distinguishable from *Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010) and similar cases cited by Appellants. In *Jelinek*, there was no causal nexus between the defendant hospital's lapse in the treatment of antibiotics and the patient's suffering, where the expert admitted there was no direct evidence that the patient had an infection treatable by the omitted antibiotics, but the patient did have two other infections that could account for all of her symptoms and for which the omitted antibiotics would have been ineffective. *Id.* at 534-535. Here, in contrast, there are no realistic alternative causes for Mrs. Rivera's sexual assault. Further, Dr. Lipson specifically considered other causes and found the evidence did not support any cause other than Appellant's negligence. (CR 21.)

---

[4] He states: "I have considered other causes of this injury. I considered if the vaginal injuries were self-inflicted. There is no evidence in Ms. Rivera's chart to indicate she engaged in either sexual self-stimulation or self-abuse. I considered the injury may have been inflicted by someone outside the facility or even a family member. There is no evidence to support this approach. There is no record the family was anything other than supportive. The timeline in the chart indicates she was [in] the facility at all relevant times save during transfer to the hospital. There is no evidence anyone sexually assaulted her when she was being transferred to the hospital to have her examined for injuries." (CR 21.)

31

## CONCLUSION

As the trial court correctly determined, Appellant's boilerplate arguments fall apart upon examination of the actual qualifications and report of Dr. Lipson. The trial court's order denying Appellant's motion to dismiss should be affirmed because Dr. Lipson is qualified and his expert report adequately sets forth the standard of care, identifies how Appellant breached the standard, and explains how the breach caused the injury Mrs. Rivera suffered. The report constitutes a good faith effort to comply with Section 74.351 because it puts Appellant on notice of the specific conduct complained of and provides the trial court with a basis on which to conclude Appellee's claim has merit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Palacios*, 46 S.W.3d at 879. The trial court did not abuse its discretion in denying Appellant's Motion to Dismiss.

## PRAYER

For the foregoing reasons, Appellee respectfully requests that the Court affirm the trial court's denial of Appellant's Motion to Dismiss. In the alternative, if the Court finds the expert report to be deficient, Appellee prays that the Court remand the case for consideration of a thirty-day extension to cure the deficiency. *See Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011) ("a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with

32

expertise that the claim has merit, and if the defendant's conduct is implicated.");

*Leland v. Brandal*, 257 S.W.3d 204, 207-208 (Tex. 2008) (court of appeals has discretion to *sua sponte* remand the case for consideration of a thirty-day extension to cure a report's deficiency).

Respectfully Submitted:


/s/ Jack Modesett, III
JACK MODESETT, III
State Bar No. 14244337
WALTER V. WILLIAMS
State Bar No. 21584800
**MODESETTWILLIAMS, PLLC**
515 Congress Ave., Suite 1650
Austin, Texas 78701
Telephone: (512) 472-6097
Facsimile: (512) 481-0130
**ATTORNEYS FOR APPELLEE**

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December 2015, the foregoing Brief of Appellee was electronically filed with the Clerk of Court using the Texas Online E-file system, and a true and correct copy was served via the Court's e-filing service, electronic mail and U. S. Regular Mail on the following counsel:

Emily J. Davenport
Janice Byington
Reed, Claymon, Meeker & Hargett, PLLC
5608 Parkcrest Drive, Suite 200
Austin, Texas 78731
edavenport@rcmhlaw.com
jbyington@rcmhlaw.com

/s/ Jack Modesett, III
Jack Modesett, III

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Tex. R. App. P. 9.4(i)(2)(B) in that it contains 7333 words, exclusive of the items identified in Tex. R. App. P. 9.4(i)(1).

/s/ Jack Modesett, III
Jack Modesett, III

CAUSE NO. D-1-GN-14-005169

| | | |
|---|---|---|
| MARTHA MAHAN, AS THE REPRE-<br>SENTATIVE OF THE ESTATE OF<br>MARY RIVERA, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | TRAVIS COUNTY, TEXAS |
| PM MANAGEMENT – AUSTIN NC, LLC<br>d/b/a GRACY WOODS I NURSING HOME | §<br>§ | 250TH JUDICIAL DISTRICT |

## PLAINTIFF'S CHAPTER 74 PRODUCTION OF EXPERT REPORT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Martha Mahan, as the Representative of the Estate of Mary Rivera, Plaintiff in the above-entitled and numbered cause, and files this, Plaintiff's Production of Expert Reports pursuant to Civil Practice & Remedies Code, Title 4, Liability in Tort, Section 74.351, and in support thereof, would respectfully show unto the Court as follows:

I.

In compliance with Civil Practice & Remedies Code, Title 4, Liability in Tort, Section 74.351, Plaintiffs hereby file the attached report of Loren Lipson, M.D. (attached hereto as Exhibit A).

## II.

Plaintiffs hereby also provide opposing counsel with copies of Loren Lipson, M.D.'s curriculum vitae (attached as Ex. 1 to Report), in compliance with Civil Practice & Remedies Code, Title 4, Liability in Tort, Section 74.351.

Respectfully Submitted,

**MODESETTWILLIAMS, PLLC**
2202 Lake Austin Boulevard
Austin, Texas 78703
512.472.6097 – Telephone
512.481.0130 – Telecopier

By: _____
Jack Modesett, III
Texas Bar No. 14244337
Walter V. Williams
Texas Bar No. 21584800

## CERTIFICATE OF SERVICE

I hereby do certify that in compliance with the provisions of Rule 21a, a true and correct copy of the above and foregoing has been served via ProDocs electronic service on this 30th day of January, 2015 as follows:

Emily J. Davenport
Kemp Smith, LLP
816 Congress Avenue, Suite 1260
Austin, Texas 78701-2443
Emily.davenport@kempsmith.com

Jack H. Modesett

# EXHIBIT A

DECLARATION OF LOREN G. LIPSON, M.D.

I, Loren G. Lipson, M.D., declare as follows:

I am a licensed physician in the State of California. I am Board-Certified in Internal Medicine, as well as in Quality Assurance and Utilization Review. I have been board certified in Geriatric Medicine.

My curriculum vitae, attached hereto as Exhibit 1 accurately reflects my education, training and experience as a Medical Doctor, Professor Emeritus of Medicine at the Keck School of Medicine at the University of Southern California, Los Angeles, California, Affiliate Professor in the Biomedical WWAMI Program, College of Arts and Sciences, and Affiliate Professor at the College of Health and Social Welfare both at the University of Alaska Anchorage. I am the former chief of the section of Geriatric Medicine and Associate Professor of Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health, and Occupational Science and Occupational Therapy, all at the University of Southern California where I have been on the faculty for over 29 years.

In addition, I am a consultant to the Department of Justice United States and the States of California and New Mexico, and the Office of the Inspector General, U.S. Department of Health and Human Services in areas of geriatric care and elder abuse. I have served as a Consultant to the Departments of Administration, Health and Social Services and Law, State of Alaska, in the areas of geriatric medicine and long term care. I also have been the Physician Advisor to USC University Hospital in areas of utilization management and quality assurance.

I have extensive personal experience in primary medical care as well as subspecialty consultation and long-term care. I personally have provided care for patients in addition to my academic teaching, research and administrative responsibilities. My background is more fully

DECLARATION OF LOREN G. LIPSON, M.D.                                    PAGE 1

described in my curriculum vitae attached hereto as Exhibit A.

I am familiar with the problem of sexual assault in the nursing home setting. I am familiar with the standard of care for preventing such assaults.

I continue to treat patients in the long term care setting and have done so for more than thirty years. I am familiar with the standard of care for the treatment of patients like Mary Rivera and familiar with the required training of employees providing care to residents like Mary Rivera.

I have reviewed the following records. They formulate a basis for my opinions in this matter.

1. The statement of the daughter, Martha Mahan;

2. The Gracy Woods I records;

3. The SANE Nurse Report;

4. The SANE Nurse Statement

5. The St. David's Hospital Records

6. The guardianship records regarding Ms. Rivera; and

7. Texas Department of Aging and Disability Services' Reports.

The nursing home had a complaint of a sexual assault of a resident several months before the assault of Ms. Rivera. This report should place the facility on a heightened alert for this problem. The facility was cited by DADS for:

1. Failing to implement written policies that protect against this activity; and

2. Failing to report the incident to law enforcement.

On June 20, 2013, Ms. Mary Rivera was placed under the guardianship of her daughter, Martha Mahan, by Judge Guy Herman. Judge Herman determined that Mary Rivera was a "totally incapacitated person without capacity to care for herself." (Ex. 1)

DECLARATION OF LOREN G. LIPSON, M.D.                                    PAGE 2

The findings of Judge Herman are consistent with the records from Gracy Woods I, (the nursing home) where Ms. Rivera was a long term resident.

When Ms. Rivera admitted to the nursing home she carried a diagnosis of dementia. A review of the nursing home chart indicates that Ms. Rivera's short- and long-term memory declined over the time of her residency. The chart indicated she frequently did not know the location of her room, the season of the year or recognize staff members. This is confirmed in the appointment of her guardian when Judge Herman finds Ms. Rivera as "totally incapacitated" due to mental as well as physical limitations.

The nursing home chart describes an individual who, while able to ambulate, clearly required careful monitoring due to significant mental limitations. The nursing home chart further indicates Ms. Rivera suffered from depression secondary to the diagnosis of dementia as well as due to her admission to the nursing home, an admission she likely did not fully understand.

The daughter of Ms. Rivera describes in her statement alcohol parties that the nursing home had on Friday afternoons. (Ex. 2) She states that another male resident would inappropriately touch or speak to Ms. Rivera. (Ex. 2) The daughter reported this concern to the management of the nursing home. The nurses caring for Ms. Rivera were aware of this behavior. (Ex. 2)

Early on November 9, 2013, a Saturday morning, the daughter visited her mother at the nursing home. She found her more confused than usual and crying. The daughter also found broken Christmas ornaments on the floor. She took her mom to the bathroom, and she appeared to be in pain. Ms. Rivera urinated standing up, which was unusual. After she put her mom back to bed, the daughter used the restroom herself. When she was discarding a paper towel she noted there was a pile of bloody rags in the trash.

DECLARATION OF LOREN G. LIPSON, M.D.                    PAGE 3

Concerned that her mother had fallen, she took the rags to the charge nurse, Wendy, who did a head-to-toe skin examination. The nursing home records confirm that no open wounds were found. The daughter ultimately took her mother to the hospital where they found bruising to her back. No vaginal exam was done at that time.

The daughter reports Ms. Rivera continued to act like she was afraid. She noted bleeding from her mother's vagina. The daughter began to suspect sexual assault. The police were notified.

Ms. Rivera was taken to St. David's Hospital. An examination was done by a Sexual Assault Nurse Examiner (SANE Nurse). The SANE nurse told Ms. Rivera that her mother had suffered vaginal trauma. The SANE nurse exam specifically found trauma to the posterior fourchette/fossa navicularis as well as trauma to the periurethral area of the vagina. (Ex. 3) In other words, she found bruising to both the front of the vagina as well as the posterior of the vaginal wall. (Ex. 3) The statement of the SANE nurse indicates the findings "definitively indicate penetration of the female sexual organ." (Ex. 4) As referenced above, Ms. Rivera was incompetent. In other words, she was sexually assaulted as she is unable to give consent to sexual contact.

Sexual assault in the nursing home environment is a very serious problem. In the four years leading up to this assault, nearly four hundred sexual assaults were reported in Texas nursing homes. At high risk are seniors such as Ms. Rivera who suffer from dementia. They are poor historians due to their illness and many suffer from impaired communication skills. As such they are extremely vulnerable.

The good news is that, if the nursing home takes a few simple steps, the assaults can be prevented. Facilities such as this nursing home are 24 hour skilled nursing facilities. This means

DECLARATION OF LOREN G. LIPSON, M.D.                                            PAGE 4

they are required by law to have skilled nursing staff as well as certified nurses' aides on duty and providing care to the residents twenty-four hours a day, seven days a week, three hundred and sixty five days a year. The nursing home in question has one hundred and eighteen beds in the entire facility. These types of assaults, according to most reports in the literature, occur at night.

The literature indicates that facilities with a history of abuse and noncompliance are more likely to have future incidents of abuse. This nursing facility has a history of reported abuse and sexual abuse and was cited by the state for several indications of neglect leading up to the assault of Ms. Rivera. The nursing home management and owners are aware of this history of abuse and are obligated to take steps to prevent future abuse. Everyone in the nursing home business is aware of the problem of sexual assault. It is well discussed in the literature and the press. Given the history of problems in the facility and the complaints of the daughter, it is foreseeable assaults like this would occur without the proper precautions.

This nursing home owes a duty of protection to patients suffering from mental incapacity due to decreased cognitive abilities. This duty includes monitoring the physical and mental conditions of the patients and meeting the fundamental care needs of the residents. Nursing homes are required to assess each resident's needs and capabilities. Some residents, like Ms. Rivera, require enhanced supervision and additional staff to protect them from others. The nursing home must take reasonable precautions to protect Ms. Rivera from the foreseeable consequences of her impairment including sexual assault. This is particularly true when there is a previously reported assault and the patient's family has voiced concerns of inappropriate behavior towards their mother.

DECLARATION OF LOREN G. LIPSON, M.D.                 PAGE 5

## STANDARDS OF CARE

1. The standard of care requires the nursing home provide twenty-four hour a day skilled nursing care. The practical result of this requirement is that the staff must be moving through the halls and the rooms of the residents all night long. There should never be a time when a staff member is not in the next room or moving through the halls next to a resident's room.

2. The standard of care requires that following the report of an assault at a nursing facility that the facility control unsupervised access to the rooms of residents at risk. The standard of care requires the facility take note of the families' concerns of inappropriate behavior and eliminate access to the patient by unsupervised males. Residents at risk include women with significant dementia such as Ms. Rivera. In light of the families expressed concern of inappropriate advances to Ms. Rivera, the standard requires heightened scrutiny to include regular walks through the entire hall at intervals not to exceed ten minutes to prevent access to her room by males. The standard of care requires the nursing staff document the fact that it is performing the regular checks in the patients' charts. In addition, the standard of care requires Ms. Rivera be moved to a room in close proximity to the nursing station following complaints of inappropriate contact with Ms. Rivera.

## BREACH OF STANDARD OF CARE

1. The facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera.

2. The facility breached the standard of care by not preventing access to her room by unsupervised males. The records do not indicate any checks on Ms. Rivera the night she was assaulted. The facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room.

## HARM

The harm caused Ms. Rivera is significant. She was sexually assaulted. The injuries to her vagina are well documented in the SANE nurse report and above. The daughter reports she was tearful and afraid. This is a common response in sexual assault victims. The daughter reports this behavior of fear continued even after Ms. Rivera was removed from the facility. The fact she suffered from dementia does not lessen the harmful mental effects of sexual assault. Even

DECLARATION OF LOREN G. LIPSON, M.D.                                    PAGE 6

an animal can remember when it has been abused. In many ways Ms. Rivera was like a small child – confused and afraid as a result of this sexual assault. The history of problems together with the decision to ignore the families' complaints and eliminate unsupervised males from Ms. Rivera's room indicates a conscious disregard for the well-being of Ms. Rivera by the facility's management.

I have considered other causes of this injury. I considered if the vaginal injuries were self-inflicted. There is no evidence in Ms. Rivera's chart to indicate she engaged in either sexual self-stimulation or self-abuse. I considered the injury may have been inflicted by someone outside the facility or even a family member. There is no evidence to support this approach. There is no record the family was anything other than supportive. The timeline in the chart indicates she was the facility at all relevant times save during transfer to the hospital. There is no evidence anyone sexually assaulted her when she was being transferred to the hospital to have her examined for injuries.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this __28th__ day of __January__, 2015.

_Loren G. Lipson, M.D._
Loren G. Lipson, M.D.

# EXHIBIT A

# CURRICULUM VITAE

## Loren G. Lipson, M.D.

### August 1, 2009

### A. Personal Information

1. **Name:** Loren G. Lipson, M.D.

2. **Titles:** Professor Emeritus of Medicine at the Keck School of Medicine of the University of Southern California, Los Angeles, California; and Affiliate Professor, Biomedical WWAMI Program, College of Arts and Sciences, and Affiliate Professor, College of Health and Social Welfare at the University of Alaska Anchorage.

3. **Mailing Address:** P.O. Box J
South Pasadena, California 91031

4. **Business Telephone:** 626-403-0169

5. **Fax:** 626-403-0165

6. **Pager:** 800-209-2380 (Numeric Only)

### B. Education

1. High School – Birmingham High School, Van Nuys, California. Graduated, June 1961.

2. University – U.C.L.A.: B.S. in Chemistry with a minor in Math and English. (Summa Cum. Laude), June 1965.

3. Medical School – The Johns Hopkins University School of Medicine, Baltimore, Maryland: M.D., June 1969

4. Internship – The Johns Hopkins Hospital, Osler Medical Service, 1969 – 1970.

5. Residency – The Johns Hopkins Hospital, Osler Medical Service, 1970 – 1971

1

6. Fellowships:

a. The Johns Hopkins University School of Medicine, Baltimore, Maryland: Clinical Fellow in Medicine, 1969-1971

b. The National Institutes of Health, Bethesda, Maryland: Research Associate — Protein Chemistry, Physical Biochemistry, Molecular Biology — Laboratory of Chemical Biology, National Institute of Arthritis, Metabolic and Digestive Diseases (NIAMDD), 1971-1973.

c. Massachusetts General Hospital, Boston, Massachusetts: Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1976

d. Harvard Medical School, Boston, Massachusetts: Clinical and Research Fellow in Medicine (Endocrinology and Metabolism),1973-1975.

e. Harvard Medical School, Boston, Massachusetts: John A. Hartford Senior Scholar in Geriatric Medicine, Division of Aging,1984-1985

f. Beth Israel Hospital, Boston, Massachusetts: Clinical Fellow in Medicine (Gerontology), 1984-1985

g. Brigham — Women's Hospital, Boston, Massachusetts: Clinical Fellow in Medicine (Gerontology), 1984-1985

h. Hebrew Rehabilitation Center for the Aged, Boston, Massachusetts: Clinical Fellow in Geriatric Medicine, 1984-1985.

i Institute of Advanced Studies on Gerontology, Ethel Percy Andrus Gerontology Center, USC, Los Angeles, California: Fellow in Institute, Area — Drugs in the Elderly, 1985-1987

j. Geriatric Research Institute, Ethel Percy Andrus Gerontology Center, USC, Los Angeles, California: Senior Research Associate, 1985-1989.

7. Honors and Award

2

| | |
|---|---|
| 1965 | Phi Beta Kappa; Recipient of Merck Award in Chemistry; Outstanding Undergraduate in Chemistry Award of Phi Lambda Upsilon; Medal for Scholarship of the American Institute of Chemists; The Ramsey Prize in Physical Chemistry; Sigma XI– All at U.C.L.A. |
| 1968 – 1969 | Henry Strong Denison Scholarship for Research in Medicine, The Johns Hopkins University School of Medicine. |
| 1975 - 1977 | National Research Service Award in Diabetes (NIAMDD), National Institutes of Health. |
| 1975 – 1978 | Daland Fellowship in Clinical Medicine, American Philosophical Society. |
| 1977 – 1978 | Clinical Investigator Award in Diabetes, NIAMDD, National Institutes of Health. |
| 1984 – 1985 | John A. Hartford Senior Scholar Award in Geriatric Medicine, Division of Aging, Harvard Medical School. |
| 1989 | The Genesis Award, For Innovative Health Care Delivery, Los Angeles Business Journal. |
| 1989 | Professional Leadership Program Award, Volunteer Center of Los Angeles. |
| 1999 | One of Top 20 Physicians in the Greater Los Angeles Area (and only Geriatrician named), Los Angeles Business Journal. |
| 2000 | One of Top Primary-Care Physicians in the U.S., Town and Country Magazine. |
| 2002 | One of Top Ten Physicians in Los Angeles, America-On-Line. |

8.  Licensure:  California.

3

9. Boards: American Board of Internal Medicine, 1974.

American Board of Quality Assurance and Utilization Review Physicians, 1995

Certificate of Expertise in Geriatric Medicine, American Board of Internal Medicine, 1996

C. Professional Background

1. Academic Appointments

a. The Johns Hopkins University School of Medicine, Baltimore, Maryland; Clinical Fellow in Medicine, 1969-1971.

b. Massachusetts General Hospital, Boston, Massachusetts; Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1976.

c. Harvard Medical School, Boston, Massachusetts; Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1975.

d. Harvard Medical School, Boston, Massachusetts; Instructor in Medicine (Diabetes), 1975-1978.

e. Massachusetts General Hospital, Boston, Massachusetts; Clinical Assistant in Medicine (Diabetes Unit), 1976-1978.

f. University of Southern California School of Medicine, Los Angeles, California; Assistant Professor of Medicine (Diabetes Division), 1978-1981.

g. University of Southern California School of Medicine, Los Angeles, California; Assistant Professor of Medicine, with tenure (Division of Diabetes and Clinical Nutrition), 1981 – January 1984.

h. Los Angeles County/University of Southern California Medical Center, Los Angeles, California; Staff Physician in Medicine (Diabetes Service), 1978 – January 1984

i. University of Southern California School of Medicine, Los Angeles, California; Associate Professor of Medicine (Division of Geriatric Medicine), January 1984 – September 2006.

4

j.      University of Southern California School of Medicine, Los Angeles, California; Chief, Division of Geriatric Medicine in the Department of Medicine, January 1984 – 2005.

k.      University of Southern California, Los Angeles, California; Associate Professor of Gerontology, Leonard Davis School of Gerontology, Ethel Percy Andrus Gerontology Center, January 1984 – September 2006.

l.      University of Southern California, Los Angeles, California; Associate Professor of Clinical Pharmacy, U.S.C. School of Pharmacy, October 1989 – September 2006.

m.      Los Angeles County/University of Southern California Medical Center, Los Angeles, California; Staff Physician in Medicine, (Geriatric Medicine), 1984-2004.

n.      Sabbatical Leave, Harvard Medical School, Boston, Massachusetts; Division of Aging, John A. Hartford Senior Scholar in Geriatric Medicine, 1984 – 1985.

o.      Brigham & Women's Hospital, Boston, Massachusetts; Clinical Fellow in Medicine (Geriatric Medicine), 1984 –1985.

p.      Beth Israel Hospital, Boston, Massachusetts; Clinical Fellow in Medicine (Geriatric Medicine), 1984 – 1985

q.      University of Southern California, Los Angeles, California; Senior Research Associate, Gerontology Research Institute, Ethel Percy Andrus Gerontology Center, 1985 – 1989.

r.      University of Southern California, Los Angeles, California; Fellow Institute of Advance Study, Ethel Percy Andrus Gerontology Center, 1985 – 1987.

s.      University of Southern California University Hospital, Los Angeles, California; Chief of Geriatric Medicine, 1991- 2005

t.      University of Southern California – School of Dentistry – Associate Professor of Medical Dentistry and Public Health, 1994 – September 2006.

u.      University of Southern California – School of Independent Health Professionals – Associate Professor of Occupational Science and Occupational Therapy, 1998- September 2006.

5

v.  University of Alaska, Anchorage – Adjunct Associate Professor of Human Biology, 2001 – September 2006.

w.  University of Alaska Southeast, Sitka – Adjunct Associate Professor of Human Studies, 2001 - 2006.

x.  University of Alaska, Anchorage, Affiliate Professor, College of Health and Social Welfare, 2006 – Present.

y.  University of Alaska Anchorage, Affiliate Professor, Biomedical WWAMI Program, College of Arts and Sciences, 2006 – Present.

z.  University of Alaska, Anchorage, Faculty Consultant in Geriatrics, Alaska Family Medical Residency, September 2006 – Present.

aa.  University of Southern California, Keck School of Medicine, Professor Emeritus of Medicine, September 2006 – Present.

2A.  Teaching Responsibilities (University of Southern California)

a.  Attending Staff Physician LAC/USC Medical Center on the General Medical Service – teaching and supervising patient care, both inpatient and outpatient to house staff and students 1985 – 2004.

b.  Attending Staff Physician at USC University Hospital in Geriatric Medicine for Medical House Staff and students. 1991 – 2005.

c.  In charge of the Fellowship Program – Geriatric Medicine. 1985 – 2004.

d.  Development and improvement of Geriatric Medical Curriculum in the Medical School – University of Southern California. 1985 – 2004

e.  Development of Geriatric Medical Core Curriculum for the Medical House Staff – LAC/USC Medical Center, 1985 – 2004

f.  Member of Steering Committee, Key Faculty and Study Site Coordinator – Pacific Geriatric Education Center at the University of Southern California (DHHS), 1984 – 1993.

g.  Attending Physician Year III Medicine Rotation, 1992.

h.  Director and lecturer in various courses at the Ethel Percy Andrus Gerontology Center including Gerontology 599 – Geriatric Health Issues.

6

i. Director — Geriatrics Update — A Board Review Course.

j. Director — History of Medicine in the Health Sciences Program, 1994 – 2001.

2B. Teaching Responsibilities (University of Alaska)

a. Director — Care of the Elderly Conference, University of Alaska, Southeast – Sitka, 1994 – Present

b. Instructor — Promoting Best Practices in Aging, University of Alaska, Anchorage, 2006 – Present

c. Co-Director — University of Washington Medical School 596 — Human Biology — Course for Alaskan Students — Multi-Disciplinary and Ethnicity in Gerontology and Geriatrics, (University of Alaska, Anchorage - Spring and Fall, 2009 and then yearly).

d. Co-Director in Geriatric Education to Alaskan Medical Students in the University of Washington Medical School WW AMI Program, University of Alaska, Anchorage, 2006 – Present

e. Faculty consultant in Geriatrics to Residents of the Alaska Family Medicine Residency Program, 2006 – Present.

3. Administrative Responsibilities

a. Chief of the Division of Geriatric Medicine, Department of Medicine, University of Southern California School of Medicine. In charge of staff and fellow recruitment and training; divisional budget; grant procurement; program development and supervision of research and clinical activity. 1984 – 2005.

b. Study Site Coordinator and Key Faculty of the Pacific Geriatric Education Center, University of Southern California School of Medicine, 1984 – 1993.

c. Senior Staff Physician in charge of Geriatric Programs at Los Angeles County/University of Southern California Medical Center, 1985 – 2004.

d. Chief of Geriatric Medicine at the USC University Hospital, 1991 – 2004.

7

e. Faculty liaison between Geriatric Medicine and University affiliated hospitals and long term care facilities. Director of Geriatric Medicine Private Practice Plan. 1984 – 2004

f. Director of the USC Ambulatory Health Center sites at the Japanese Retirement Homes and Angelus Plaza, 1985 – 1993.

g. Director of the Division of Geriatric Medicine's Program at the V.A. Outpatient Clinic in downtown Los Angeles, 1986 – 2001.

h. Director of the USC Teaching Nursing Home Program at Hollenbeck Home and Atherton Baptist Home, 1999 – 2005.

i. Director of the Senior Cancer Center at Norris Comprehensive Cancer Center and Hospital, 1999 – 2001.

j. Director of the Senior Care Program – USC Care and USC Physicians. 1998 – 2002.

k. Co-Director – Adult Protective Team – Geriatric Medicine Program – LAC/USC Medical Center, 2000 – 2004.

l. Director – Care of the Elderly Conference, University of Alaska Southeast, Sitka, 1994 – Present.

m. Co-Director – Geriatric Education for Alaskan Medical Students in the WWAMI Program, University of Alaska, Anchorage. 2006 – Present.

n. Medical Director – Alaska Geriatric Education Center, University of Alaska, Anchorage. 2005 – Present.

o. Medical Director – National Resource Center for Studies in Native American, Alaskan, and Hawaiian Elders, University of Alaska, Anchorage, 2006 - Present

4. Service

A. University Service

a. Medical Executive Committee, Department of Medicine, USC 1985 – 2003.

b. Utilization Management Committee, USC University Hospital, 1991 – 1999, 2003 – Present, Chairman of this Committee, 1994 – 1999.

8

c. Pharmacy and Therapeutics Committee, LAC/USC Medical Center, 2001 – 2004.

d. Pharmacy and Therapeutics Committee, USC University Hospital, 1991 – 2005, Chairman, 1996 – 2000.

e. Patient Care Evaluation Committee, USC University Hospital, 1994 – 1999.

f. Lecturer in School of Pharmacy, University of Southern California, 1985 –2004.

g. Continuing Medical Post-Graduate Education Lectures at outlying hospitals, 1979 – 2004.

h. Core Curriculum Committee for the New Medical School Curriculum, USC School of Medicine, 1998 – 2002

i. County Operations Committee, Department of Medicine, LAC/USC Medical Center, 1997 – 2000

j. Development Committee, Department of Medicine, LAC/USC Medical Center, 1997 – 2000.

k. Senior Health Care Program, USC Care, (chair/member), USC 1998 – 2002.

l. Executive Committee, USC Norris Comprehensive Cancer Center and Hospital – Senior Cancer Care Center, 1998 – 2001.

m. Co-Director – Adult Protective Team – Geriatric Medicine Program – LAC/USC Medical Center, 2000 – 2004.

B. Public Service

a. Consultant in Geriatric Medicine and Long Term Care, State of Alaska, Departments of Administration Law, Health and Social Services, 1991 –2004

b. Consultant in Gerontology and Geriatric Medicine, University of Alaska, both at the Anchorage and Sitka campuses, 1994 – present.

c. Board of Directors, California Association of Medical Directors, 1992-1999.

d. Citizen's Oversight Committee — California Stem Cell Research & Cures Act, 2007 – Present.

e. Board of Directors, USC Friends of Music, 1989 – 1997.

f. Task Force on Elder Abuse, City of Los Angeles, 2001 – 2004.

g. California Rare Fruit Growers, 1988 – Present.

h. Pennsylvania Horticulture Society, 1992 – 2007.

i. Affenpinscher Club of America, 2002 – Present.

j. Kennel Club of Pasadena, 2004 – 2007.

5. Military Service

1971 – 1973  Active duty as Surgeon – U.S.P.H.S. serving as Research Associate (Protein Chemistry) in the Laboratory of Chemical Biology with Dr. Robert Goldberger and Dr. Christian Anfinsen, NIAMDD, NIH: Inactive Reserve U.S.P.H.S. 1969 – 1971, 1973 – 1979.

6. Other Activities

a. Editor for ENDOCRINOLOGY for Diabetes and Intermediary Metabolism, 1985 – 1986.

b. Member of the Committee of Interdisciplinary Geriatric Education, Association for Gerontology in Higher Education, 2002 – 2006.

c. Reviewer for:   AMERICAN JOURNAL OF PHYSIOLOGY
ANNALS OF INTERNAL MEDICINE
ARCHIVES OF INTERNAL MEDICINE
BIOCHEMICAL MEDICINE
DIABETES
ENDOCRINILOGY
EXPERIMENTAL GERONTOLOGY
JOURNAL OF CLINICAL ENDOCRINOLOGY AND METABOLISM
JOURNAL OF GERONTOLOGY
HORMONE AND METABOLISM RESEARCH
JOURNAL OF THE AMERICAN GERIATRICS SOCIETY
DRUGS AND AGING
NEW ENGLAND JOURNAL OF MEDICINE

10

D. Society Memberships

   1. Local

       Cross Town Endocrine Club
       Professional Staff Association of LAC/USC Medical Center
       Center Fellow of the UCLA/USC Long Term Care Gerontology Center
       Far Eastern Study Center USC/UCLA
       California Association of Medical Directors

   2. Regional

       Western Society for Clinical Investigation
       Western Section of the American Federation for Clinical Research

   3. National

       Sigma Xi, Phi Beta Kappa, Phi Lambda Upsilon
       The Johns Hopkins Medical and Surgical Society
       The Johns Hopkins History of Medicine Club
       The Associates of the Countway Library
       The American Association for the History of Medicine
       American Federation for Clinical Research
       American Diabetes Association
       The Endocrine Society
       American Physiological Society
       The Gerontological Society of America
       The American Geriatric Society
       The American Federation for Aging Research
       American Gerontological Association
       American Association of Medical Directors

E. Consultantships and Directorships

   1. Consultant in Geriatric Medicine and Supervisor of the Geriatric Program at the Veterans Administration Outpatient Clinic in downtown Los Angeles, 1986 – 2001.

   2. Executive Director of the USC Ambulatory Health Center at Angelus Plaza, 1989 – 1993.

   3. Board of Directors, California Association of Medical Directors, 1992 – 1999.

   4. Board of Director, USC friends of Music, 1989 – 1997.

11

5. Consultant in Geriatric Medicine and Long Term Care – State of Alaska 1991 – 2004:

    a. Department of Administration
    b. Department of Health and Social Services
    c. Department of Law
    d. Mental Health Board

6. Appointments in Geriatrics – University of Alaska:

    a. Sitka

        I. Adjunct Associate Professor of Human Studies, 2003-2006.
        II. Course Director – Care of the Elderly Conference, 1994 Present

    b. Anchorage

        I. Affiliate Professor, College of Arts and Sciences, Biomedical WWAMI Program, 2006 – Present
        II. Consultant, Co-Founder and Medical Director – Alaska Geriatric Institute through the Alaska Geriatric Education Center, 2003 – Present.
        III. Consultant – Institute of Circumpolar Health
        IV. Consultant and Medical Director – National Resource Center for American Indians, Alaska Natives and Native Hawaiian Elders, 2005 – Present.
        V. Faculty Consultant in Geriatrics, Alaska Family Residency Program, 2005 – Present
        VI. Affiliate Professor, College of Health and Social Welfare.

7. Consultant, British Columbia Health Foundation, 1994 – 1999.

8. Consultant in Geriatric Medicine and Long Term Care, Silverado Senior Living Centers, San Juan Capistrano, CA 2001 – 2002.

9. Consultant in Geriatric Medicine and Supervisor of the Geriatric Medicine Medical House Staff Training Program, Kern Medical Center, Bakersfield, CA 1986 – 2003.

10. Consultant in Geriatric Medicine and Supervisor of the Geriatric Family Medicine House Staff Training Program, Glendale Adventist Medical Center, Glendale, CA 1998 – 2001

11. Consultant in Geriatric Program Development — Bay Shores Medical Group, Torrance, CA., 1986 – 1989.

12. Consultant in Geriatric Program Development — San Dimas Community, Hospital, 1986 – 1989.

13. Consultant in Geriatric Program Development and Long Term Care - Keiro Services — The Japanese — American Retirement Homes, Los Angeles, CA., 1986 – 1993.

14. Consultant in Geriatric Program Development and Long Term Care — The Motion Picture and Television Home, Woodland Hills, CA 1986 – 1990.

15. Consultant in Long Term Care and Geriatric Medicine, State of California, Department of Social Services, 2000 – Present.

16. Consultant in Elder Abuse, Geriatric Medicine and Long Term Care, State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – Present.

17. Consultant in Long Term Care, Elder Abuse and Geriatric Medicine — State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse — Operation Guardians (nursing homes - unannounced inspections) 2000 – Present.

18. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse — State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003 – Present.

19. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Rights Division, 2006 – Present.

20. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Health and Human Services, Office of the Inspector General, 2006 – Present.

21. Board of Directors, Musica Angelica, 2006 – Present.

F. Research Activities

1. Research Interests

   a. Use of medications in the senior populations with specific emphasis on prescribing habits of physicians.

13

b. Health care systems and delivery modes for the demented elderly in Alaska.
c. Drug interactions in the elderly, looking at drug-drug interactions, changed actions, polypharmacy, misuse and abuse.
d. Studies in the elderly diabetic patient.
e. Studies in the elderly hypertensive patient.
f. Studies in sexual dysfunction in the elderly.
g. Studies in elder abuse.
h. Maintenance of independence of living in frail and demented seniors.

2. Research in Progress: Investigations in man

a. Studies in prescribing habits of physicians in retirement housing.
b. Studies of adverse drug effects in the aging population with special emphasis on the most commonly prescribe medication and psychotropic agents.
c. Studies on care of frail and demented seniors in Alaska.
d. Studies on the prevention and early detection of elder abuse.
e. Studies on decreased longevity in the Pueblo Indians.

G. Long Term Care Experience

1. Director of the two USC Teaching-Nursing Home Programs, 1999 - 2005

a. Hollenbeck Home – Los Angeles
b. Atherton Baptist Home – Alhambra

2. Member and Member Board of Director, California Association of Medical Directors, 1992 – 1999.

3. Consultant – State of Alaska, Department of Administration, Division of Longevity Services (Aging Programs and State of Alaska Long Term Care Facilities – the Pioneers' Homes). 1991 – 2004.

4. Affiliate Professor, College of Health and Social Welfare and College of Arts and Sciences, University of Alaska, Anchorage. Areas of involvement – Alaska Geriatric Education Center, Geriatric Assessment, Pre-med and Medical Education, Long Term Care, 2006 to Present.

5. Consultant – University of Alaska, Sitka. Areas of involvement – Care of Elderly Conference – Director, 1994 - Present

6. Consultant in Long Term Care, Elder Abuse and Geriatric Medicine – State of Alaska, Department of Law, 2000 – 2003

14

7. Consultant in Long Term Care and Geriatric Medicine — State of California, Department of Social Services.

8. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse — State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – 2003.

9. Consultant in Long Term Care — State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse — Operation Guardians (nursing home- unannounced inspections), 2000 – Present.

10. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse — State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003 – Present.

11. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Rights Division, 2006 – Present.

12. Primary care provider for Geriatric Medicine for Long Term Care Patients — Hollenbeck Home, Los Angeles, California, 1998 – 2004.

13. LAC/USC Medical Center Clinic — Adult Protective Team — Geriatric Medicine — Clinic Co-director, 2000 – 2004.

14. Member of the American Association of Medical Directors.

15. USC — Angeles Plaza — Senior Clinic — Founding Director and care provider (1989 – 1992). (The largest low-income senior housing project in the Western United States).

16. Consultant in Geriatric Medicine and Long Term Care — Silverado Senior Living Centers, San Juan Capistrano, 2001 – 2002.

17. Consultant in Geriatric Program Development and Long Term Care — Keiro Services — The Japanese American Retirement Homes, Los Angeles, 1986 – 1994.

18. Consultant in Geriatric Program Development and Long Term Care — The Motion Picture and Television Home, Woodland Hills, CA, 1986 – 1990

H. **Significant Invited Lectures (Since July 1984 — selected from over 3,500 lectures given)**

1. Harbor General Hospital — U.C.L.A. Medical Center, 7/84.

15

Medical Grand Rounds – new concepts in the treatment of Type II Diabetes.

2. Harbor General Hospital – U.C.L.A. Medical Center, 7/84.
Endocrine Grand Rounds – The newer oral agents.

3. Martin Luther King General Hospital, Los Angeles, CA, 7/84
Medical Grand Rounds – The approach to the patient with NIDDM.

4. Nisei Awareness Day, Little Tokyo, Los Angeles, CA, 7/84
Health issues for the elderly. Keynote speech.

5. The Cleveland Clinic, 9/84. Symposium on Diabetes Mellitus –
The Treatment of the Patient with NIDDM.

6. American Academy of Family Practice, Kansas City, MO, 10/84
National Meeting, Invited Speaker:
   a. Nutrition in the elderly
   b. New concepts in the therapy of the Type II diabetic patient.

7. Associates of the Countway Library, Harvard Medical School, 11/84.
Biannual History of Medicine lecture – "The Black Death Comes to America."

8. Washington University of St. Louis and St. Louis V.A. Hospital, 11/84.
Symposium on Diabetes Mellitus – The treatment of hypertension in the patient with Diabetes Mellitus.

9. The Jackson Laboratory, Bar Harbor, Maine, 12/84.
Visiting Scientist – Insulin secretion in aging.

10. Gordon Research Conference, Oxnard, CA, 2/85. The biology of aging –
Invited Speaker – Cyclic AMP and insulin secretion in aging.

11. Thorndike Rounds, Beth Israel Hospital, Boston, MA 3/85.
The approach to the treatment of diabetes mellitus in the elderly individual.

12. Division on Aging, Harvard Medical School, 3/85.
Grand Rounds – Hyperosmolar coma – a complication of diabetes mellitus in the Elderly.

13. The University of New Brunswick, Saint John, N.B., 3/85.
Visiting professor of Biology, Lecture topics:

   a. The role of calmodulin in insulin secretion.

16

b. The exciting new approaches to the treatment of diabetes mellitus.

14. Beth Israel Hospital, Boston, MA, 3/85
Endocrine Grand Rounds – Sex and the diabetic.

15. The Johns Hopkins University Scholl of Medicine, Baltimore, MD, 3/85.
Visiting Professor of the History of Medicine, Lecture topic – "Black Death Come to America."

16. Brigham-Women's Hospital, Boston, MA, 3/85
Endocrine Grand Rounds – Insulin secretion in aging.

17. Yale University School of Medicine, New Haven, CT, 4/85
Endocrine Research Conference – Insulin secretion in aging.
Hypertension Grand Rounds – Special problems of hypertension in the diabetic patient.

18. University of Florida, Gainesville, FL 4/85
Geriatric Medicine Grand Rounds – The older diabetic patient.

19. University of California at Los Angeles School of Medicine, 4/85, Family Medicine Grand Rounds – Treatment of diabetes mellitus in the elderly.

20. Stanford University of Medicine – V.A. Hospital, Menlo Park, CA, 5/85,
Clinical Conference – Sexual dysfunction in the elderly.

22. University of Pittsburgh School of Medicine, Pittsburgh, PA, 6/85.
Symposium on Diabetes Mellitus – The older diabetic patient.

23. University of Hawaii School of Medicine, Honolulu, HI, 8/85
Medical Grand Rounds – Diabetes in the elderly.

24. Department of Public Health and Social Welfare, Guam, 8/85
Special Lecture – Wellness and pathology in the elderly.

25. American Academy of Family Practice, Anaheim, CA, 10/85.
National Meeting – Invited Speaker – Diabetes in the elderly.

26. University of California at San Francisco – Valley Medical Center, Fresno, CA, 11/85. Endocrine symposium – Sexual Dysfunction in the elderly.

27. Mayor's Conference on Aging, Los Angeles, CA, 3/86. Treatment of chronic diseases in the elderly.

APPENDIX 1

40

28. V.A. Hospital, Martinez, CA and U.C. Davis School of Medicine, 4/86. Medical Grand Rounds – Treatment of hypertension in diabetic patients.

29. Pasadena Council on Alcoholism, Pasadena, CA, 4/86. Symposium on the Older Alcoholic Patient. Pathology and normalcy in aging.

30. Brown University Medical School, Providence, RI 4/86. Medical Grand Rounds – Hypertension in the elderly.

31. Medical Board Drug Review, Sacramento, CA, 5/86. Invited Speaker – The new oral agents.

32. Conference – Scientific Basis of Sexual Dysfunction – Sponsored by NIH and the National Kidney Foundation, Baltimore, MD, 6/86.

33. F.D.A. Symposium of Bioequivalence of Solid Preparations, Washington, D.C., 10/86. Invited Speaker – Oral sulfonylurea agents.

34. University of Nevada, Reno, NV, 2/87. Visiting Professor of Medicine, Lecture topic – Sex after 60.

35. University of Guam, Guam, USA, 4/87. Symposium on Care of the Elderly – Symposium Leader.

36. National Council on Hypertension, Biannual Meeting, Las Vegas, NV, 4/87. Invited Speaker – Antihypertensive medications and sexual dysfunction.

37. American Hospital Pharmacists Association, Washington, D.C. 5/87. Invited Speaker – Aging in America – Wellness vs. Disease.

38. University of California, Davis – School of Medicine, 6/87. Course on Medicine, Invited Speaker – Hypertension in the elderly.

39. University of Nevada, Las Vegas, Nevada, 10/87. Visiting Professor of Medicine, Lecture Topics: Geriatric Medicine Today, Geriatric Course Planning.

40. California Pharmacy Association, San Francisco, CA, 11/87. Invited Speaker – Endocrinology of aging.

41. Evanston Hospital, Northwestern University School of Medicine, Evanston, IL, 11/87. Visiting Professor of Medicine, Topic – Sex after 60.

18

42. Conference on Pathogenesis and Treatment of Pressure Sores. Kansas City, MO, 1/88. Invited Speaker.

43. Conference on "What Pharmaceuticals are Needed for the Elderly?" Phoenix, AZ, 2/88. Invited Speaker.

44. Conference on "Post Retirement Health Care Funding" sponsored by I.R.I., New York, NY, 3/88. Invited Speaker – The geriatric imperative.

45. Board Review Course: Geriatrics Update, 1988, U.S.C. School of Medicine, Pasadena, CA, 3/88. Two and one-half day symposium on geriatrics. Director, Moderator and Presenter for the course.

46. Symposium on Geriatric Medicine – Motion Picture and Television Retirement Home And Hospital, Woodland Hills, CA, 4/88. Moderator and Presenter.

47. American Geriatric Society National Meeting, Symposium and Physician – Patient Communication, Anaheim, CA, 5/88. Co-moderator and presenter.

48. Symposium on Geriatric Medicine, San Dimas Community Hospital, San Dimas, CA, 9/88. Moderator and Presenter.

49. American Society for Enteral and Parental Nutrition Conferences: Ethics and Nutrition, New York, NY, 10/88

50. Symposium on Nutrition in the Elderly, California Medical Center, Los Angeles, CA, 12/88. Moderator and Presenter, Topic – Nutrition in the Elderly.

51. California Academy of Family Medicine, Annual Meeting, San Francisco, CA 2/89. Invited Keynote Speaker, Topic – Dementia.

52. Kansas University Medical Center, Family Medicine Grand Rounds, Kansas City, KS, 5/89. Visiting Professor, Topic – Drugs in the elderly.

53. California Association for Homes for the Aged, Annual Meeting. Symposium on Drugs In the Elderly, San Diego, CA, 5/89. Invited Speaker, Topic – Medical Aspects of Drugs in the Elderly.

54. Symposium on Geriatric Care, Motion Picture and Television Home, Woodland Hills, CA, 6/89. Moderator and Presenter, Topic – Tests and exams periodically needed for Senior health

-19-

55. Symposium of Diseases Affecting Extended Care Management of the Elderly, California Federation on Aging, Newport Beach, CA, 6/89. Moderator.

56. Symposium of Diabetes in the Elderly, USC School of Medicine, Los Angeles, CA, 8/89. Moderator.

57. V.A. Medical Center, Phoenix, AZ, 9/89. Medical Grand Rounds, drugs in the Elderly.

58. Geriatric Medicine Symposium, Hawaii Medical Association, 9/89, Invited Speaker, Topic – Hypertension in the Elderly.

59. University Medical Center of Kansas City, Kansas City, MO, 9/89. Medical Grand Rounds – Sex after 60.

60. National Conference of Consulting Actuaries, Hot Springs, VA, 9/89. Invited Speaker.

61. California Pharmacists Association, Los Angeles, CA, 10/89. Endocrinology in the Elderly. Program Director.

62. Family Medicine Program, Santa Rosa, CA, 11/89. Visiting Professor of Geriatric Medicine.

63. Symposium on Geriatric Medicine. Tacoma General Hospital, Tacoma, WA, 1/90. Course Director and Speaker.

64. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 2/90. Course Director and Speaker.

65. University of Nevada School of Medicine, Reno, NV, 3/90. Visiting Professor of Geriatric Medicine.

66. USC Geriatric Review Course, USC School of Medicine, Los Angeles, CA, 3/90. Two and one-half day intensive course in geriatric medicine. Course Director and Speaker.

67. Eisenhower Hospital, Rancho Mirage, CA, 3/90. Medical Grand Rounds – Drugs in the Elderly.

68. American Geriatric Society Annual Meeting, Atlanta, GA, 5/90. Symposium on Syndrome X: The correlation of diabetes and hypertension.

69. American Diabetes Association Symposium, Santa Barbara, CA, 6/90. Diabetes in The Mexican American Population. Invited Speaker.

20

70. Loma Linda University School of Medicine, Loma Linda, CA, 7/90. Grand Rounds, Drugs in the Elderly.

71. American Heart Association/ American Diabetes Association Symposium, Santa Barbara, CA, 9/90. Treatment of the hypertensive diabetic patient. Keynote Speaker.

72. Baylor College of Medicine, Houston, TX, 10/90. Symposium on the Complicated Diabetic. Invited Speaker.

73. City of Hope, Duarte, CA, 1/91. Medical Grand Rounds, Diabetes in the Elderly.

74. Providence Hospital, Anchorage, AK, 2/91. Medical Grand Rounds, Sex after 60.

75. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/91. Course Director and Speaker.

76. U.C.S.F. – Valley Medical Center, Fresno, CA, 3/91. Medical Grand Rounds, Sex after 60.

77. U.C.D. – Sacramento, CA, 4/91. Medical Grand Rounds, Sex after 60.

78. Chicago Medical College, Chicago, IL, 5/91. Medical Grand Rounds, Drugs in the Elderly.

79. Symposium of Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 2/92. Course Director and Speaker.

80. Department of Administration, State of Alaska, 4/92. Invited Speaker, Assisted living in long term care.

81. International Institute for Research Symposium: Utilities and FAS 106, Washington, D.C., 7/92. Keynote Speaker, Drugs in the retired population.

82. Alaska Geriatric Institute, Anchorage, AK, 2/93, Keynote Speaker.

83. University of Oklahoma, Tulsa, OK, 3/93. Family Medicine Grand Rounds, Drugs in the elderly.

84. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/93. Course Director and Speaker.

85. Department of Administration, State of Alaska, 4/93. Invited Speaker, Medications in the nursing home population.

86. Dallas Business Group on Health, 5/93. Invited Speaker, Medications in the Elderly.

87. Symposium on Retirement Healthcare Benefits, Chicago, IL, 9/93. Invited Speaker, Medications in the elderly.

88. University of Hawaii, Division of Geriatric Medicine, Honolulu, HI, 10/9/93. Visiting Professor of Geriatric Medicine, Diabetes in the elderly, Use of drugs in the elderly.

89. Providence Hospital, Anchorage, Alaska. Medical Grand Rounds, 2/94. Dementia.

90. Nevada Academy of Family Medicine, Annual Meeting. Lake Tahoe, Nevada, 2/94. Keynote Speaker — Sex after 60.

91. University of Colorado Affiliated Hospital. Medical Grand Rounds, 3/94. Drugs in the Elderly.

92. University of Kentucky Affiliated Hospital. Geriatric Medical Grand Rounds, Lexington, Kentucky, 4/94. Dementia.

93. Alaska Psychiatric Institute — API 2000 Meeting, Anchorage, Alaska, 6/94, Plans for the Future — Consultant and Facilitator.

94. USC School of Medicine, Los Angeles, California — Medical Grand Rounds, 9/94. Drugs in the elderly.

95. Alaska State Mental Health Board — Quarterly Meeting, Dillingham, Alaska, 9/94. Invited Speaker, The Alaska Geriatric Institute.

96. Alzheimer's Society of Northern California, Sacramento, CA, 10/94. Speaker, Research in dementia.

97. Alaska Geriatric Institute, Anchorage, Alaska, 2/95. Organizer and Keynote Speaker. The largest health care symposium in the history of the state of Alaska.

98. V.A. Medical Center Westwood and UCLA — Medical Grand Rounds, 2/95.

99. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/95. Course Director and Speaker.

100. Nevada Academy of Family Medicine, Annual Meeting, Lake Tahoe, Nevada, 3/95. Keynote Speaker – Dementia

101. Idaho Academy of Family Medicine, Annual Meeting, Sun Valley, Idaho, 5/95. Keynote Speaker – Dementia: Sex after 60.

102. Martin Luther King, Jr. Medical Center, Los Angeles, CA, 6/95. Medical Grand Rounds – Dementia.

103. Martin Luther King, Jr. Medical Center, Los Angeles, CA, 8/95. Medical Grand Rounds – Sex after 60.

104. University of Alaska, Southeast – Sitka Geriatric Symposium, Sitka, Alaska, 9/95. Organizer, Keynote Speaker.

105. V.A. Outpatient Clinic, Las Vegas, NV, 10/95. Medical Grand Rounds, Dementia.

106. V.A. Outpatient Clinic, Los Angeles, CA, 11/95. Grand Rounds – Dementia.

107. V.A. Outpatient Clinic Los Angeles, CA, 12/95. Grand Rounds – Sleep disorder in the elderly.

108. State of Alaska, Division of Senior Services, 2/96. Lectures and site visits to six State of Alaska nursing homes.

109. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/96. Course Director and Speaker.

110. Family Medicine Training Program, Spokane, Washington, 3/96. Lecture – Dementia.

111. Family Medicine Training Program, Central Montana, 4/96. Lecture – Drugs in the Elderly.

112. University of Utah Affiliated Programs, Salt Lake City, 4/96. Lecture – Depression in the Elderly.

113. State of Alaska, Department of Administration, Division of Senior Services, Course Coordinator for visits of 16 Alaskan State officials to USC School of Medicine, Andrus Gerontology Center and affiliated local Southern California Geriatric Programs. Duration – one month, early May to early June, 1996, Los Angeles, CA.

23

114. State of Alaska, Division of Senior Services, Department of Administration. Site visit to Administrative offices for review of Geriatric Programs. Juneau, Alaska, 6/96. Outside Consultant and Lecturer.

115. University of Alaska, Southeast Sitka. Care of the Elderly Symposium, Sitka, Alaska, 9/96. Course Director and Lecturer.

116. Boise Health Consortium — Medical Grand Rounds, Boise, Idaho, 11/96. Sex after 60.

117. Symposium on Long Term Care for Providers, Milwaukee, Wisconsin, 2/97. Keynote Speaker — Drugs in the elderly.

118. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/97. Course Director and Speaker.

119. Osteopathic Medical College, Des Moines, Iowa, 4/97. Symposium on diabetes Mellitus, Keynote Speaker — Diabetes in the Elderly.

120. University of Southern Illinois Medical School, Champaign, Urbana, Illinois, 4/97. Medical House Staff Lectures. Topics — Diabetes in the Elderly, Drugs in the Elderly.

121. Allegheny Medical School, Philadelphia, PA, 5/97. Keynote Speaker — Symposium on Diabetes and Lipids in the Elderly.

122. State Senior Care Program, Oklahoma City, Oklahoma, 7/97, Keynote Speaker — State of Oklahoma Senior Care Program.

123. Eastern Carolina University Medical School, Greensboro, North Carolina, 8/97. Medical Grand Rounds.

124. University of Alaska, Southeast Sitka. Care of the Elderly Symposium, Sitka, Alaska, 9/97, Course Director and Lecturer.

125. University of Colorado, Denver, CO, 10/97. University of Colorado Affiliated Programs, Several States, Medical Grand Rounds.

126. Arizona Chapter of the American Gerontologic Society, Phoenix, AZ, 11/97. Sex After 60.

127. Symposium of Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/98. Course Director and Speaker.

128. Medical University of South Carolina, Charleston, South Carolina, 4/98. Family Medicine Grand Rounds, Sex After 60.

129. University of Colorado, Denver, CO, 4/98, University of Colorado Affiliated Programs, Several Sites, Medical Grand Rounds.

130. Eisenhower Medical Center, Rancho Mirage, CA, 4/98. Medical Grand Rounds, Drugs in the Elderly.

131. University of Alaska and U.S.C., Sitka, Alaska, 9/98. Care of the Elderly Symposium, Course Director and Speaker.

132. University of South Carolina School of Medicine, Charleston, South Carolina, 10/98. Family Medicine Grand Rounds, Sex After 60.

133. V.A. Outpatient Clinic, Los Angeles, CA, 10/98. Memorial Lecture Series, Medications in the Elderly.

134. V.A. Outpatient Clinic, Los Angeles, CA, 10/98, Memorial Lecture Series Alzheimer's disease.

135. Visiting Professor of Geriatric Medicine, Alaska Geriatric Institute, Anchorage, Alaska, April, 1/99. Multiple Lectures.

136. Visiting Professor of Geriatric Medicine, University of New Mexico School of Medicine, Albuquerque, New Mexico, 6/99, Alzheimer's disease.

137. University of Alaska, Sitka, Alaska, 9/17/99-9/19/99. Care of the Elderly Conference, Course Director and Lecturer.

138. Visiting Professor of Geriatric Medicine, University of Arizona Affiliated Hospitals of Tucson and Phoenix, AZ, 10/20/99-10/23/99.

139. Symposium of the Gerontological Society of America, San Francisco, CA, 11/21/99. Interdisciplinary Approaches to Teaching Geriatrics, Invited Speaker.

140. State of Alaska, Anchorage, Alaska, 2/20/00-2/23/00. Task Force for the Assessment of Assisted Living in the Pioneers' Homes, Leader and Spokesperson.

141. Visiting Professor of Geriatric Medicine, University of Colorado School of Medicine Affiliated Hospitals, Denver, Colorado, 3/7/00-3/8/00.

142. Visiting Professor of Geriatric Medicine, Affiliated Internal Medicine Programs, El Paso, Texas, 4/26/00-4/27/00.

25

143. Newport Beach, California, 5/5/00. Annual Meeting of the California Association of Medical Directors, Invited Speaker.

144. Antelope Valley Hospital, Lancaster, California. Medical Grand Rounds, 11/17/99. Treatment of Arthritic Pain in the Elderly.

145. Kern County Medical Center, Bakersfield, California. Medical Grand Rounds, 1/7/00. Hazards of Drug Therapies in the Elderly.

146. Hoag Hospital, Newport Beach, California. Medical Grand Rounds, 3/10/00. Sex After 60.

147. Visiting Professor of Geriatric Medicine, Affiliated Internal Medicine Programs, El Paso, Texas. 4/26/00-4/27/00

148. Arrowhead Medical Center, San Bernardino County Hospital, Colton, California, 5/17/00. Medications in the Elderly.

149. "Annual Meeting of the California Association of Medical Directors," Invited Speaker, Newport Beach, California. 5/5/00.

150. Riverside General Hospital, Merino Valley, California, 6/16/06. Medical Grand Rounds, Medications in the Elderly.

151. The Elderly Diabetic. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

152. Treatment of Arthritic Pain. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

153. Depression in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

154. Treatment of Hypertension in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

155. Medications in the Elderly. Continuous Quality Improvement (CQI) in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Anchorage, Alaska, 11/13/00.

156. Falls in the Elderly. Continuous Quality Improvement (CQI) in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Anchorage, Alaska, 11/13/00.

157. Dementia. Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 1/2/01.

158. Geropsychiatric Assessment of the Elderly. Bureau of Medi-Cal Fraud and Elder Abuse, Department of Justice, State of California, Ontario California, 2/22/01.

159. Treating Chronic Pain in the Elderly. Memorial Lecture Series, Outpatient Department, Veterans Administration Los Angeles, California, 1/2/01.

160. Medications in the Elderly. Continuous Quality Improvement (CQI) and the Risk-Plus Program in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Sitka, Alaska, 5/1/01.

161. Falls in the Elderly. Continuous Quality Improvement (CQI) and the Risk-Plus Program in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Sitka, Alaska, 5/1/01.

162. Sexuality. North American Forum on Women's Health, Los Angeles, California, 6/19/01.

163. Alzheimer's Disease. North American Forum on Women's Health, Los Angeles, California, 6/19/01

164. Geropsychological Evaluation of Seniors. Symposium on Elder Abuse. Department of Justice-Bureau of Medical Fraud and Elder Abuse, Rancho Mirage, California, 9/7/01

165. Depression in the Elderly. Hoag Hospital. Newport Beach, California, 9/7/01.

166. Sleep Disorders in the Elderly. Care of the Elderly Conference, University of Alaska – Sitka, Sitka, Alaska, 9/23/01.

167. Medications in the Elderly. Memorial Hospital, Santa Rosa, California, 10/19/01.

168. Dementia. Medical Grand Rounds, Riverside General Hospital, Marino Valley, California, 11/15/01.

169. Dementia in the Elderly. Medical Grand Rounds, Arrowhead Medical Center, San Bernardino General Hospital, Colton, California, 11/29/01.

170. Patient and Family Satisfaction in Long Term Care. Alaska Pioneers' Home, Anchorage, Alaska. A site visit and symposium, 12/11/01-12/15/01.

171. Normal Aging vs. Disease. Symposium on Geriatric Medicine. Annenberg Center, Rancho Mirage, California, 2/202.

172. Medications in the Elderly, Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 2/26/02.

173. Life Style Redesign in Elder Care. 2nd Annual North American Forum on Women's Health, Anaheim, California, 3/1/02.

174. Dementia in the Elderly. Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 3/12/02.

175. Diabetes in the Elderly. Endocrine Grand Rounds, Harbor General Hospital, Torrance, California, 4/1/0/2.

176. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Anchorage and Fairbanks, 4/22/02-4/26/02.

177. Treatment of Pain in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka. Sitka, Alaska, 9/19/02.

178. Treatment of Cardiovascular Risk Factors in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska 9/19/02.

179. Special Issues in Long Term Care. Assessment and Evaluation of the Anchorage Pioneers' Home, Anchorage, Alaska, 12/10-12/14/02.

180. Identification and Treatment of Cardiovascular Risk Factors in the Elderly – A symposium Montgomery Cardiology Programs. Montgomery, Alabama, 3/21/03.

181. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Anchorage and Fairbanks, 4/23-4/26/03.

182. Assessment of Mental Competency and Discussion of an Elder Abuse Case. Symposium on Elder Abuse, Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse, Squaw Valley, California, 5/27-5/30/03.

183. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Juneau and Ketchikan, 6/27-6/29/03.

184. Dementia in the Elderly: Medications in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Sitka, Alaska, 9/18-9/19/03.

185. Dementia. Geriatric Symposium – St. Mary's Hospital and Scan, Long Beach, California, 10/4/03.

186. Senior Assessment for the Care Provider. Public Health Forum — State of Alaska. Anchorage, Alaska, 12/1/03.

187. Senior Assessment Workshop, Alaska Geriatric Education Center, University of Alaska, Anchorage, Alaska, 1/23/04.

188. Sleep Disorders in the Elderly. Coping with Chronic Disease. Care of the Elderly Conference, University of Alaska, Anchorage, Alaska, 9/17/04.

189. Elder Abuse. Coping with Chronic Disease. Cardiovascular Risk Factors in the Elderly. Senior Lives Conference, University of Alaska, Anchorage, Alaska 6/10/05.

190. Assessment of the Chart in Skilled Nursing Facilities. Symposium on Elder Abuse, Department of Justice, Bureau of Medical Fraud and Elder Abuse, Long Beach, California, 6/6-6/9/05.

191. Coping with Chronic Disease. The Chart in the Skilled Nursing Home. Care of the Elderly Conference, University of Alaska, Sitka, 9/16/05.

192. Sex After 60. The Chart in the Skilled Nursing Home. Promoting Best Practices in Aging Conference, University of Alaska, Anchorage — 6/8/06 — 6/10/06.

193. Medical Realities and Diminished Tribal Longevity. New Aspects of Long Term Care. Care of the Elderly Conference, University of Alaska , Sitka, 9/14/06 – 9/16/06.

194. Standard of Care, Symposium on Elder Abuse, Department of Justice, State of California, Bureau of Medi-CAL Fraud and Elder Abuse, San Mateo, California May 2007.

195. Integrated Therapies for Aging. The Therapies, Care of the Elderly Conference, University of Alaska, Southeast, Sitka 9/25/08 – 9/27/08.

196. Human Biology 596 Course University of Washington Medical School — WWAMI Program — Multi-Disciplinary and Ethnicity in Gerontology and Geriatrics. Lectures to Alaskan Medical Students, University of Alaska, Anchorage, April 2009.

197. Mental Health and Dementia. Inter-disciplinary Practice in Geriatrics Sex After 60. Prompting Best Practices in Aging Conference, University of Alaska, Anchorage, 6/3/09 – 6/5/09.

I. PUBLICATIONS

-29-

Papers — Peer Review

1. McCleverty, J.A. and Wilkinson, G. (Submitters), Lipson, L.G., Maddox, M.D. and Kaesz, H.D. (Checkers): Dichlorotetracarbonyldirhodium. Inorganic Synthesis Vol. VIII, oltzclaw, H.F., Jr. (Ed) McGraw-Hill, New York, 1966, pp.211-214.

2. McCleverty, J.A. and Wilkinson, G. (Submitters), Lipson, L.G., Maddox, M.D. and Kaesz, H.D. (Checkers): Chlorocarbonylbis (triphenylphospine) rhodium and chlorocarbonylbis (triphenylarsine) rhodium. Inorganic Synthesis Vol. VIII, Holtzclaw, H.G. Jr. (Ed), McGraw-Hill, New York, NY 1966, pp214-217.

3. Lipson, L.G., Capuzzi, C.M. and Margolis, S.M: Effect on method of cell isolation on the metabolic activity of isolated rat liver cells. J. CellSC. 10:167-179, 1972.

4. Lipson, L.G.: Plague in San Francisco in 1900, Ann. Int. Med. 77:303-310, 1972.

5. Kohler, T.R., Lipson, L.G., Flores, J., Witkum, P.A., Fischer, J.B., and Sharp, G.W.G.: Sequence of events in the activation of adenylate cyclase by cholera toxin. Bull Schweitz, Akad. Med. Wiss. 32-223-232, 1976.

6. Beiteins, I.Z., Lipson, L.G. and McCarthur, J.W.:Luteinizing hormone, follicle stimulating hormone and their subunits released in culture by human pituitary tumors. J. Clin. Endo. Metab. 45:1271-1280, 1977.

7. Fischer, J.B., Kohler, T.R., Lipson, L.G., Flores, J., Witkam, P.A., and Sharp, G.W.G.: Studies on the time course and rate limiting steps in the activation of adenylate cyclase by cholera toxin. Biochem. J. 173: 59-64, 1978.

8. Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J.W., Friesen, H.G., Kliman, B. and Kjelberg, R.N.: Tissue culture studies on human pituitary tumors: Radioimmunoassay of anterior pituitary hormones in culture medium. Acta. Endocrin. 88:239-249, 1978.

9. Lipson, L.G. and Sharp, G.W.G.: Insulin secretion in pregnancy: Studies on adenylate Cyclase, phosphodiestarase, protein kinase and phosphoprotein phosphotase in isolated islets of Langerhans of the rat. Endocrinology 103:1272-1280, 1978.

10. Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J.W., Friesen, H.G., Kliman, B. and Kjelberg, R.N.: Tissue culture studies on human

pituitary tumors: Long-term release of anterior pituitary hormones. Acta. Endocrin. 90:421-433, 1979.

11. Lipson, L.G., Siegal, E., Wohlheim, C.B. and Sharp, G.W.G.: Insulin release in fasting: Studies on adenylate cyclase, phosphodiesterase, protein kinase and phosphoprotein phosphatase in isolated islets of Langerhans of the rat. Endocrinology 105:702-717, 1979.

12. Lipson, L.G., Bush, M.J., Tietjen, G.E. and Yoon, A.: Role of the adenylate cyclase system in altered insulin release from islets of Langerhans of aging rats. Acta. Endocrin. 96:222-226, 1981.

13. Lipson, L.G., Bobrycki, V.A., Bush, M.J., Tietjen, G.E. and Yoon, A.: Insulin release in aging: Studies on adenylate cyclase, phosphodiesterase and protein kinase in islolated islets on Langerhans of the rat. Endocrinology 108: 602-624, 1981.

14. Lipson, L.G., Moore, D., Pope, A.M., Todd, G.J., and Avila, S.: Sexual dysfunction in Hypertensive diabetic patients. J. Cardiovascular Med. 6: Supp. 1, 30-37, 1981.

15. Cotton, D.B., Strassner, H.G., Lipson, L.G., and Goldstein, D.A.: The effects of terbutaline on acid-base, electrolytes and glucose homeostasis during the management of preterm labor. Am. J. Obstet. And Gyn. 141: 617-624, 1982.

16. Oldham, S.B., Lipson, L.G. and Tietjen, G.E.: Evidence for the presence of calmodulin in human parathyroid tissue. Mineral and Electrolyte Metabolism 7: 273-280, 1982.

17. Lipson, L.G., Oldham, S.B.: The presence of calmodulin – stimulatable phosphodiesterase in pancreatic islets of Langerhans of pregnant and normal female rates. Life Sciences 32: 775-780, 1983.

18. Mircheff, A.C., Conteas, C.N., Lu, C.C., Santiago, N.A., Gray, G.M. and Lipson, L.G.: Basal-lateral and intracellular membrane populations of the rate exorbital lacrimal gland. Am. J. Physiol. 245: G 133-142, 1983.

19. Premdas, F.H., Molina, J.M. and Lipson, L.G.: Insulin release in aging: Role of glyceraldehydes. Acta. Endocrin. 103: 539-543, 1983.

20. Lipson, L.G. and Lipson, M.: Treatment of the obese maturity onset diabetic patient, Arch. Int. Med. 144: 135-138, 1984.

21. Oldham, S.B., Molloy, C. and Lipson, L.G.: Calcium inhibition of adenylate cyclase in the parathyroid gland. Endocrinology 114: 207-214, 1984.

22. Lipson, L.G.: Sexual dysfunction in the diabetic patient with hypertension. Am. J. Cardiol. 53: 46A-50A, 1984.

23. Lipson, L.G.: Special problems in the treatment of hypertension in the patient with diabetes mellitus. Arch. Int. Med. 144: 1829-1831, 1984.

24. Oldham, S.B., Rude, R.K., Molloy, C. and Lipson, L.G.: The effect of magnesium on calcium inhibition of parathyroid adenylate cyclase. Endocrinology. 115: 1883-1890, 1984.

25. Molina, J.M., Premdas, F.H., Klenck, R.E., Eddlestone, G., Oldham, S.B. and Lipson, L.G.: The dynamic insulin secretory response of isolated pancreatic islets of the diabetic mouse: Evidence for a gene dosage effect on insulin secretion. Diabetes 33: 1120-1123.

26. Eddlestone, G.T., Oldham, S.B., Lipson, L.G., Premdas, F.H. and Beigelman, P.M.: Electrical activity, cAMP concentration and insulin release in mouse islets of Langerhans, Am. J. Physiol. 248: C 145-153, 1985.

27. Molina, J.M., Premdas, F.H. and Lipson, L.G.: Insulin release in aging: Dynamic response of isolated islets of Langerhans of the rat to D-glyceraldehyde. Endocrinology 116: 821-826, 1985.

28. Oldham, S.B. and Lipson, L.G.: The high affinity calcium inhibition of parathyroid adenylate cyclase is not calmodulin-dependent. Calcif, Tissue Int. 38: 275-281, 1986.

29. Bailey, C.J., Day, D., Bray, G.A., Lipson, L.G. and Flatt, P.R.: Role of adrenal glands in the development of the abnormal glucose and insulin homeostasis in genetically obese (ob/ob) mice. Hormone and Metabolism Research, 18: 357-360, 1986.

30. Prochazka, M., Premdas, F.H., Leiter, E.H. and Lipson, L.G.: Estrone treatment dissociates primary versus secondary consequences of "diabetes" (DB) gene expression in mice. Diabetes, 35: 725-728, 1986.

31. Lipson, L.G.: Diabetes in the elderly: Diagnosis, pathogenesis, and therapy. Am. J. Med. 80: Supp. 5A: 10-21, 1986.

32. Fadda, G.Z., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S.G.: Insulin release from pancreatic islets: Effects of CRF and excess PTH. Kidney Int. 33: 1066-1072, 1988.

33. Leiter, E. H., Premdas, F.H., Harrison, D.H. and Lipson, L.G.: Aging and glucose homeostasis in C57BL/6J male mice. FASEB Journal. 2: 2807-2811, 1988.

34. Fadda, G.Z., Akmal, M., Lipson, L.G., Soliman, A. and Massry, S.G.: Correction of glucose intolerance and the impaired insulin release of chronic renal failure by verapamil. Kidney Int. 36: 773-770, 1989.

35. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Direct effect of parathyroid hormone secretion from pancreatic islets. Am. J. Physiol., 258 (Endocrinol. Metab. 21): E975-E984, 1990.

36. Mulligan, R., Lipson, L.G. and Heaton, S. G.: Detecting diabetes in an elderly dental patient population. Special care in Dentistry: Feature Article: September-October, 142-147, 1990.

37. Xin-Gin, Z., Fadda, G.Z., Lipson, L.G. and Massry, S.G.: Phosphate depletion impairs insulin secretion by pancreatic islets. Kid. Int. 39: 120-128, 1991.

38. Fadda, G.Z., Hajjar, S.M., Perna, A.F., Chau, X.J., Lipson, L.G. and Massry, S.G.: On the mechanisms of impaired insulin secretion in chronic renal failure. Jour. Clin. Invest. 87: 225-261, 1991.

39. Clark, F. Carlson, M., Zimke, R., Frank, G., Patterson, K., Larson, B., Rankin-Martinez, A., Hobson, L., Crandall, J., Mandel, D. and Lipson, L.G.: A qualitative study of the life domains and adaptive strategies of the low income, well elderly. Am. J. Occup. Therapy, 1994

40. Clark F. Carlson, M., Zimke, R., Frank, G., Patterson, K., Ennevor, B., Rankin-Martinez, A., Hobson, L., Crandall, J., Mandel, D.and Lipson, L.G.: Life domains and adaptive strategies of a group of low-income, well older adults. Am. Jr. of Occupational Therapy, 99-108, 1995.

41. Rho, Jay P. and Lipson, L.G.: Focus on acetylcholinestrerase inhibitor for the treatment of Alzheimer's disease. Formulary, Vol. 32, 677-684, 1997.

42. Clark, F., Azen, S.P., Zemke, R., Jackson, J., Carlson, M., Mandel, D., Hay, J., Josephson, K., Cherry, B., Hessle, C., Palmer, J. and Lipson, L.G.: Occupational Therapy for Independent-Living Older Adults. JAMA, 278: 1321-1326, 1997.

43.    Clark, F., Azen, S.P., Carlson, M., Mandel, D., LaBree, L., Hay, J., Zemke, R., Jackson, J. and Lipson, L.G.: Embedding health-promoting changes into the daily lives of independent-living older adults: Long-term follow-up of occupational therapy intervention. Journal of Gerontology: Psychological Sciences, 56B, pp. 60-63, 2001.

Requested Chapters, Papers, and Monograms

1.    Sharp, G.W.G., Fisher, J.G., Lipson, L.G., Kohler, T.R., Flores, J. and Witkum, P.A.: Time course studies on the mechanisms of action cholera toxin. Hormonal Receptors in Digestive Tract Physiology. In Bonfils, S., Fromageot, P., Rosselin, G. (eds.), Eldevier-North Holland Biomedical Press, Amdsterdam, pp.447-454, 1976.

2.    Sharp, G.W.G., Wiedenkeller, D.E., Lipson, L.G., Oldham, S.B., Krausz, Y., Janjis, D., Pian-Smith, M.C.M. and Wollheim, C.B.: Multiple roled of calmodulin, the endocrine pancreas and the control of insulin secretion. Proceedings of the 11th Congress of the International Diabetes Federation. Int. Congress Series #600: Excerpta Medica, Princeton, N.J., Mngola, En.N. (Ed.) pp 329-336, 1983.

3.    Lipson, L.G.: Hypertension and diabetes mellitus. Diabetes forecast 38:53, 1985.

4.    Lipson, L.G.: Diabetes mellitus in the elderly: Special problems, special approaches. Co. Medical, New York, N.Y., pp. 1-20, 1985.

5.    Lipson, L.G.: Diabetes after sixty-five. Diabetes Forecast. Vol. 39, No. 7, 54-58, 1986.

6.    Lipson, L.G.: Diabetes in the elderly: A multifaceted problem. Am. J. Med. 80: supp. 5A:1-2, 1986.

7.    Lipson, L.G. and Bray, G.A." Energy intake and utilization in aging man: Chen (ed.), Nutritional Aspects of Aging, Vol. 1, CRC press, Ino., Boca Raton, FL. Pp. 184-185, 1986.

8.    Lipson, L.G.: Diabetes and aging. In Beigelman, P.M. and Kuman, D., (Eds), Diabetes Mellitus for the house officer. Williams and Wilkins, Baltimore, MD., pp. 184-185, 1986.

9.    Lipson, L.G. and Kumar, D.: Oral hypoglycemic agents. In Beigelman, P.M. and Kumar, D. (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MC. Pp. 112-118, 1986.

10. Lipson, L.G.: Dental problems in the diabetic patients. In Beigelman, P.M. and Kumar, D. (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp. 181-183, 1986.

11. Lipson, L.G.,: Hypertension in the diabetic patient. In Beigelman, P.M. and Kumar, D., (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp 160-163, 1986.

12. Lipson, L.G.: Hypertension in the diabetic patient. In Beigelman, P.M. and Kumar, D., (Eds.), Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp. 173-175, 1986 .

13. Dinwiddie, R. and Lipson, L.G.: Improved control of serum glucose in obese, new-onset insulinopenic non-insulin dependent diabetes mellitus: Partial respiration of Norman dynamic insulin secretion. Roerig Division, pp. 1-6, 1986,

14. Lipson, L.G. and Kato-Palmer, S.: Diabetes in Asians. Diabetes Forecast, Vol, 41, No, 9, 48-51, 1988.

15. Lipson, L.G., Kato-Palmer, S., Boggs, W.L., Moore,D., and ope, A.: Diabetes in the Black population. Diabetes Forecast Vol. 41, No. 9, pp. 34-38, 1988.

16. Williams, B.R., Nichol, M.B., Lowe, B.F., McCombs, J.S., Yoon, P.S. and Lipson, L.G.: pharmacist intervention residential care facilities. In Rowe, J.W, and Ahronheim, J.C. (Eds.) Annual Review of Gerontology and Geriatrics; Focus on Medications and the Elderly. Springer Publishing Co. New York, N.Y., pp. 150-162, Vol. 12, 1992.

17. The Use of Medications: A Training and Reference Manual Developed for Staff in Residential Care Facilities for the Elderly, 1195. Lipson, L.G. – Project Co-Director.

18. Weiner, J. and Lipson, L.G.: Human diseases as models of accelerated aging. In Rosen, C., Glowacki, J. and Bilezikian, J. (Eds.) The Aging Skeleton, Academic Press, Chapter 6: pp. 51-58, 1999.

19. Raghaven, D., Weiner, J. and Lipson, L.G.: Cancer in the elderly : principles of treatment in Soulhami, R.L. et al (Eds.), Oxford Textbook Oncology, 2nd Edition, Oxford University Press, Oxford, London, 1999.

Films and Videos

1. Discharge Planning for the Elderly Hospitalized Patient: I. What to do when you go Home. Hospital Satellite Network, 1986. 15 min. L.G. Lipson – Moderator and Context Exper.

2. Discharged Planning for the Elderly Hospitalized Patient: II. The patient with acute medical problems after discharge. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

3. Discharge Planning for the Elderly Hospitalized Patient: III. The chronically disabled patient. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

4. Discharge Planning for the Elderly Hospitalized Patient: IV. Community programs for the elderly. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

5. Normal Aging Versus Disease. Physician Journal Update. Lifetime Network, 1987, 15 min. L.G. Lipson – Content expert.

6. Drugs and the Elderly. Physician's Journal Update. Lifetime Network, 1987, 15 min. L.G. Lipson – Content expert.

7-26. Caring for and Aging Society. 20 videos on various aspects of Geriatrics and Gerontology. Each 30 minutes in length. Producer – Neil Steinberg Productions, Executive Producers – Hospital Satellite Network and Age Wave, Sponsor – Marion Laboratories. 1987-1988. L.G. Lipson – Technical advisor and content expert.

## CARING FOR AN AGING SOCIETY

### SHOW TITLES AND NUMBER

| NSP# | HSN# | TITLE | EXPERT |
|------|------|-------|--------|
| 001 | 8649X | NEW IMAGES OF AGING (F) | DYCHTWALD |
| 002 | 0462X | HOW TO TALK TO YOUR DOCTOR (F) | LIPSON |
| 003 | 5733X | GERIATRIC ASESSMENT (F) | BUTLER |
| 004 | 8648X | DRUGS AND THE ELDERLY (F) | LAMY |
| 005 | 7716X | ACUTE CARE GERIATRIC NURSING (F) | FULMER |
| 006 | 5734X | HEART DISEASE AND THE ELDERLY (F) | SWAN |
| 012 | 8650X | PRINCEPLES OF AGING (F) | HAZZARD |
| 013 | 5735X | PRESENTATION OF DISEASE (F) | ABRASS |
| 014 | 5736X | GEROPSYCHIATRIC FOUNDATIONS (W) | OLSEN |
| 015 | 5737X | PHYSICIAN'S ROLE IN DRUG THERAPY (F) | VESTAL |
| 016 | 8652X | ETHICAL ISSUES IN ELDERCARE (F) | CASSEL |
| 017 | 7717X | GEROPSYCHIATRIC NURSING (W) | WYKLE |
| 018 | 6725X | THE HUB CONCEPT (W) | DYCHTWALD |
| 019 | 6726X | ELDERCARE FINANCING (W) | DYCHTWALD |

| 020 | 6727X | ELDERCARE: MODELS OF SUCCESS (F) | DYCHTWALD |
|-----|-------|-----------------------------------|-----------|
| 021 | 5738X | DIABETES IN THE ELDERLY (W) | LIPSON |
| 022 | 8651X | GERIATRIC DISCHARGE PLANNING (F) | WERTHEIMER |
| 023 | 0473X | PROMOTING WELLNESS (W) | FARQUHAR |
| 024 | 0475X | SELF-MEDICATION IN THE ELDERLY (W) | SIMONSON |
| 025 | 0474X | FAMILY ROLES IN HEALTHCARE FOR THE ELDERLY | BRATTER |

27. Medical Checkup: Health Awareness '88. Aging in the Black Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

28. Medical Checkup: Health Awareness '88 Aging in the Hispanic Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

29. Medical Checkup: Health Awareness '88. Aging in the Asian Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

30. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Black Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

31. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Asian Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

32. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Hispanic Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

33-38. Diet and Exercise – Lifestyles for Aging. Hospital Satellite Network. Six 10-minute Segments, 1989. L.G. Lipson – content expert.

39. How to Talk to the Older Patient. Baylor Hospital and Age Wave, 1989. L.G. Lipson – Medical Moderator and content expert.

40-41. The Aging Skin. Age Wave, 1991. L.G.Lipson – Medical Editor.

42. Diabetes and the Elderly. Living with Diabetes: Diabetes on the Air, 1991.

43. Sex and Sexuality in Seniors – A Documentary, 1999 L.G. Lipson – Guest Expert.

Abstracts

APPENDIX 1

60

*1.    Lipson, L.G., Margolis, S.M. and Capuzzi, D.M.: Comparison of acetate and amino acid incorporation in rat liver cells isolated by three techniques. Fed. Proc. 28:336 (abst. 607), 1969.

2.    Lipson, L.G., Ackerman, I.P. and Kliman, B.: simultaneous acromegaly and partially suppressible adrenocortical function in a patient with a pituitary tumor. Clin. Res. 24: 274A, 1976.

3.    Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J. W., Friesen, H.G., Kliman, B. and Kjelberg, R.N. Hormone secretory patterns of human pituitary tumors in tissue culture. Clin. Res. 328A, 1976.

4.    Lipson, L.G., Forristall, C.A. and Sharp, G.W.G. Phosphorylation and dephosphorylation in the control of the insulin release: Islet phosphoprotein phosphatase. Diabetes 25: Supp. 1,374 (abst. 213), 1976.

*5.    Lipson, L.G., Vachon, C., Forristall, C.A., and Sharp, G.W.G.: Stimulation of specific protein phosphorylation in intact rats islets of Langerhans by both 3-isobutyl-1-methlxanthine and D-glucose. Clin. Res. 26:530A, 1978.

6.    Lipson, L.G. and Sharp, G.W.G.: Insulin release in pregnancy: Relationship to protein and phosphorylation. Endocrinology 102: (abst. 711), 1978.

7.    Lipson, L.G. Wollheim, C.B. and Sharp, G.W.G.: Insulin release in fasting. Diabetes 27: Supp. 2, 489 (abst. 236), 1978.

8.    Lipson, L.G., Bobrycki, V.A., Bush, M.J., Gross, E. and Inouyte, D.: Role of adenylate cyclase system in altered insulin release from islets of aged rats. Clin.Res. 28:51A, 1980.

*9.    Cotton, D.B., Strassner, H.G., Lipson, L.G. and Goldstein, D.A.: Effect of terbutaline on serum concentrations of glucose, insulin, potassium, ionized and total calcium lactate, and colloid osmotic pressure. Gyecol. Invest. 1980.

*10.    Lipson, L.G., Bush, M.J., Tietjen, G.E. and Yoon, A.: Insulin release in aging: the role of adenylate cyclase system. Endocrinology 106: (abst. 34), 1980.

11.    Mircheff, a.C., Lipson, L.G., Bush, M.J., Yoon, A. and Barish, J.J.: Analytical fraction of B-cells. Diabetes 29: Supp. 2, 109A (abst. 425), 1980

12.    Moore, D., Pope, A.M., Todd, G.J., Rosenquist, R.J., and Lipson, L.G.: Treatment of hypertensive diabetic patients with prazosin. Diabetes 29: Supp. 2, 67A (abst. 267) 1980.

*13.    Oldham, S.B., Lopson, L.G. and Tietjen, G.E.: Evidence for the presence of calmodulin in human parathyroid tissue. VIII International Conference in Calcium Regulating Hormones, 1980.

APPENDIX 1

61

*14. Lipson, L.G., Bush, M.J. and Bobrycki, V.A.; The role of the adenylate cyclase system in the decreased glucose-stimulated insulin release from isolated islets of Langerhans of aging rats. Gordon Research Conference – The Biology of Aging, 1980.

15. Lipson, L.G. Oldham, S.B. and Bush, M.J.; Calmodulin – stimulatable phosphodiestarase in isolated islets of Langerhans of the rat. Clin. Res. 29:56A, 1981.

16. Lipson, L.G., Moore, D., Pope A.M., Todd, F.J. and Avila, S.: Incidence of hypertension in male diabetic populations. Clin. Res. 29:413A, 1981.

17. Lipson, L.G. and Oldham, S.B.: Colmodulin-stimulatable phosphodiestarase in pancreatic islets of the pregnant rat. Clin. Res. 29-413A, 1981.

*18. Conteas, C.N., Lipson, L.G. and Mircheff, A.C.: Basal lateral membranes from rat parotid acinar cells. Gastroenterology 80: 1128A, 1981.

19. Lipson, L.G. and Oldham, S.B.: The presence of a calmodulin-stimulatable phosphodiestarase in pancreatic islets from pregnant and normal female rats. Endocrinology 108:343, (abst. 1942), 1981.

20. Lipson, L.G. Bush, M.J. and Najdziuk, J.: Insulin release in aging: Role of glyceraldehydes. Diabetes 30: Supp. 1 (abst. 296), 1981.

*21. Lipson, L.G.: Insulin release in aging. Gordon Research Conference – The Biology of Aging. 1982.

22. Lipson. L.G., Moore, D., Pope, A.M. and Todd, G.J.: Sexual dysfunction in hypertensive diabetic patients: The role of prazosin in its prevention. Diabetes 31: Sup. 2 (abst. 365), 1982.

*23. Oldham, S.B. and Lipson, L.G.: Biphasic inhibition of parathyroid adenylate cyclase activity by calcium. Calif. Tissue int. 34:S43, 1982.

*24. Lipson, L.G., Premdas, F.H., Molina, J.M.:Studies on dynamic insulin release in aging. The physiologist 25: 288 (abst. 47.8), 1982.

*25. Molina, J.M., Premdas, F. H. and Lipson, L.G.: Dynamics of insulin secretion in aging Clin.Res. 31:58A, 1983.

*26. Sharp, G.W.G., Wolheim, C.B., Siegel, E., Lipson, L.G. and Kraus, Y.: The role of calmodulin in insulin secretion. International Diabetes Fed. Meeting in Kenya, November 1982.

*27. Eddlestone, G.T., Oldham, S.B., Lipson, L.G. and Beigelman, P.M.: Forskolin increases cyclic AMP and potentiates electrical activity in the mouse pancreatic B-cell. Fed. Proc. 42: 897, (abst. 3544), 1983.

APPENDIX 1

62

*28.     Eddlestone, G.T., Oldham, S.B., Lipson, L.G. and Beigelman, P.M.: Forskolin potentiation of the B-cell response to glucose. Diabetes 32; Supp. 1(abst. 552), 1983.

*29.     Oldham, S.B. and Lipson, L.G.: The effects of ionic calcium on magnesium activation of parathyroid adenylate cyclase. Calcif. Tissue Int. 35:686, 1983.

*30      Premdas, F.H., Molina, J.M. and Lipson, L.G.: Restoration of normal dynamic insulin in secretion in aging rats. The Physiologist 26:A50, (abst. 32.1), 1983.

*31.     Oldham, S.B. and Lipson, L.G.: Calcium inhibition of parathyroid adenylate cyclase: Is calmodulin medicated? VIII International Conference on Calcium Regulation Hormones, Kobe, Japan, October, 1983.

32.      Johnson, M.D. and Lipson, L.G.: Prevalence of Hypertension and sexual dysfunction in diabetic women. Clin. Res. 32:48A, 1984.

*33.     Molina, J.M., Premdas, F.H., Lipson, L.G., Klenck, R., Eddlestone, G. and Oldham, S.B.: Comparison of dynamic insulin release to D-glucose and D-glyceraldehyde in isolated pancreatic islets from the db/db mouse. Clin. Res. 32:51A, 1984.

*34.     Oldham, S.B. and Lipson, L.G.: Ionic control of parathyroid adenylate cyclase activity. UCLA symposium 1984 on Membrane Receptors and Cellular Recognition.

35.      Lipson, L.G., Liebig, P.S. and Sloane, R.B.: Training of faculty mentors and advocates in geriatrics. Annual Meeting of Gerontological Society of America. November, 1984, San Antonio, Texas.

*36.     Lipson, L.G., Premdas, F.H., Molinas, J.M. and Lewis, D.: Cyclic AMP and insulin secretion. Gordon Research Conference – The Biology of Aging, 1985.

*37.     Fadda G., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S. G.: Direct evidence of an inhibitory effect if parathyroid hormone (PTH) on insulin release in chronic renal failure (CRF). Kidney International. 31:348, 1987, American Society of Nephrology, Washington, D.C., 1986.

*38.     Fadda G., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S. G.: Correction of glucose intolerance (GINT) and the impaired insulin release o chronic renal failure (CRF by verapamil. American Society of Nephrology, San Antonio, Texas 1988.

39.      Palmer, S.K., Madison, R.E. and Lipson, L.G.: Self-reported prevalence and associated factors in type II diabetes in Japanese Americans in Los Angeles. Diabetes: 37:150A (abst. 587), 1988.

*40.     Garcia, D.L., Palmer, S.K., Boggs, W.L. and Lipson, L.G.: Challenges in-patient compliance of elderly Mexican American Diabetics. Diabetes: 37:68A (abst. 269), American Diabetes Association, New Orleans, L.A., 1988.

41. Schwam, W.J., Lefevre, T.M. and Lipson, L.G.: Falls in the elderly: The use of multiple balance tests. Nov. 1988 meeting of Gerontological Society of America.

*42. Oldham, S.B., Eddlestone, G.T., Premdas, F.H. and Lipson, L.G.: the influence of age on glucose and forskolin – stimulated insulin release from islets of the diabetic mouse. No. 1988 meeting of Gerontological Society of America.

*43. Lipson, L.G.: Caring for an aging society – twenty 30 minute videos on gerontology and geriatrics. Nov. 1988, meeting of Gerontological Society of America.

*44. Palmer, S.K., Madison, R.E. and Lipson, L.G.: Diabetes in older Japanese-Americans. November 1988 meeting of Gerontological Society of America.

*45. Boggs, W.L., Garcia, D.L., Palmer, S.K., and Lipson, L.G.: Patient compliance in an ethnic population: Diabetes care in elderly Mexican-Americans, Nov. 1988, meeting of Gerontological Society of America.

*46. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Correction of Glucose Intolerance (GINT) and the impaired insulin release of chronic renal failure (CRF) by Verapoamil. Kidney Int. 35:427, 1989, 1989 Meeting of the 21st National Kidney Foundation scientific Symposium.

*47. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Evidence for a direct effect of parathyroid hormone (PTH) on pancreatic islets. Kidney Int. 37:466, 1990, 1990 meeting of the 22nd National Kidney Foundation Scientific Symposium.

*48. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Mechanism of impaired insulin secretion in chronic renal failure. Kidney Int. 37:505, 1990. 1990 meeting of the 22nd National Kidney Foundation Scientific Symposium.

*49. Communale, R., Fadda, G.Z., Premad, F.H., Thanakitcharu, P, Lipson, L.G. and Massry, S.G.: Reduced K-induced insulin secretion in chronic renal failure (CRF) contribute to impaired extrarenal disposal of K: Role of excess PTH. Am. Soc. Nephrol. 1:624, 1990.

*50. Williams, B., Lowe, B., Nichol, M., McCombs, J., Yoon, P. and Lipson, L.G.: Improving drug therapies in residential care facilities. 1994 Annual Meeting of the American Geriatric Society, Los Angeles, CA.

*51. Lipson, L.G., McCombs, J., Jelliffe, R., Williams, B., and Wilson, P.: Medications I the elderly: problems, policies and new solution, a symposium. 1995 Annual Meeting of the Gerontological Society of America, Los Angeles, CA.

*52. Lipson, L.G. and Kohn, J.: Governmental responsiveness to changes in demographics of aging disease: A unique state approach to geriatric ADRD care and treatment. 1996 Annual Meeting of Southern Medical Association, Baltimore, Maryland.

41

53. Symposium Annual Meeting of Gerontological Society of America, San Francisco, California, 1998.

*Presented

I. Grants and Research Funding (1975-2001)

1. National Research Service Awards in Diabetes, 1975-1977. NIAMDD, NIH. 1F32 AM 05219 MET.

2. Clinical Investigator Award in Diabetes. 1977-1978. NIAMDD, NIH. 1 KOB AM 0320 MET. Two additional years of support were given up in order to change institutions.

3. Daland Fellowship in Clinical Medicine (Diabetes Research) of the American Philosophical Society, 1975-1978.

4. NIH research Grant – "Pregnancy: Its role in altered insulin release." NICHID, NIH 1/79 through 12/81, $134,000. 1RO1 HD 12517. L.G. Lipson, P.I.

5. American Diabetes Association Grant – "Mechanism of Insulin Release." 3/79 through 8/80. L.G. Lipson, P.I.

6. American Cancer Society Pilot Project Grant – "Tissue Culture Studies on Human Pituitary Tumors." 10/78 – 9/79. L.G. Lipson, P.I.

7. Los Angeles County Medical Association Auxiliary Grant – "Research in Clinical Diabetes." 7/78-1/82. L.G. Lipson, P.I.

8. NIH Research Grant – "Calcium modulated proteins in the parathyroid." NIAMDD, NIH 1R01 am 27816. 12/80 through 6/85. *205,000 L.G. Lipson, Co-P.I.

9. NIH Training Grant – "Training in Endocrine Hypertension and Endocrinology – Metabolism." NIAMDD, NIH. T 32 AM 07119. 7/80 THROUGH 6/85 $414,500. L.G. Lipson, Instructor.

10. NIH Training Grant – "Training in the Endocrinology and Neurobiology of Aging." NIA, NIH, 9/82 through 8/87, $803,882. L.G. Lipson, Co-director. AG 00093.

11. NIH Research Grant – "Microencapsulation: A novel transplantation technique." NIA, NIH. 3/83-2/85. L.G. Lipson, P.I.

12. American Diabetes Association Grant – "The role of cyclic AMP in insulin secretion in the diabetic mouse." 8/83 through 1/85. L.G. Lipson, Co-P.I.

42

13. DHHS Center Grant – "Geriatric Education Center Grant," DHHS 1D31 AH 69000. $952,000. 10/83 through 9/88. L.G. Lipson, Faculty Coordinator and Member of the Steering Committee.

14. NIH Center Grant – "Southern California Consortium for the Study of Alzheimer's Disease." NIA, NIH. 1/85 through 12/89. $750,000/year. L.G. Lipson, Clinical Investigator.

15. John A. Hartford Senior Scholar Award in Geriatric Medicine – at Harvard Medical School. 9/84 through 8/85. L.G. Lipson, Awardee.

16. Research Grant from Roerig, Pfizer Pharmaceuticals, "Diabetes in Elderly Mexican Americans." 1/86 through 7/87. $80,000 L.G. Lipson, M.D., P.I.

17. Research Grant from Ross Laboratories, "Diet and Dementia." 1/88 through 12/89. $37,500. L.G. Lipson, M.D., P.I.

18. Research Grant from Hoechst Pharmaceuticals – "Neuropathy in the Elderly." 1/88 through 12/89, $27,500. L.G. Lipson, M.D., P.I.

19. Research Grant from Boehringer Ingelheim Pharmaaceuticals – "Control of Mild Hypertension in the Elderly Inner – City Population." 6/88 through 12/88. $45,000. L.G. Lipson, M.D.,P.I.

20. Research Grant from Marion Laboratories – "A New Treatment for Pressure Sores." 6/88 through 3/89. $15,000 L.G. Lipson, M.D., P.I.

21. Research Grant from Roerig Pharmaceuticals – "Diabetes in the Elderly." 7/1/89 – 12/31/90. $15,000, L.G. Lipson, M.D., P.I.

22. Research Grant from the John A. Hartford Foundation – "Prescribing Habits of Physicians in Retirement Housing." 2/89 through 1/93. $487,000. L.G. Lipson, M.D., P.I.

23. DHHS center Grant – "Geriatric Education Center." 10/89 through 9/92. $450,000 L.G. Lipson, M.D. Clinical Site Coordinator, Key Faculty Member, and Member of the Steering Committee.

24. Geriatric Medicine Fellowship Grant from the Japanese Retirement and Skilled Nursing Facilities (Keiro Services), 7/88 through 7/90, $170,000. L.G. Lipson, M.D., P.I.

25. Geriatric Medicine Fellowship Grant from the Motion Picture and Television Retirement Home and Hospital, 7/87 through 6/90. $50,000/year. L.G. Lipson, M.D., P.I.

26. NIH Research Grant – NIDDK – "Subtle Disturbances of Cobalamin Status." 2R01-DK32640-07. 2/1/91 through 1/31/95, $235,827. L.G. Lipson, M.D., Co-Investigator.

43

27. Development Grant – USC Irvine Foundation. Diversity Project. Course Development. "Diversity in Aging: Roles in Ethnicity, Gender, Biology and Environment." 1992-onward, $5,000. L.G. Lipson, M.D., Course Director and P.I.

28. NIH Research Grant – "Multicenter Trail of Prednisone in Alzheimer's Disease." 1995, $80,000. L.G. Lipson, M.D., Co-P.I.

29. State of Alaska – Educational Grant "Training of Administrators in Long Term Care Institutions and Health Care Providers and Planners in Special Topics of Gerontology and Geriatrics." 3/1/96 – 5/20/96, $16,000. L.G. Lipson, M.D., Director.

30. Glendale Adventist Medical Center – "Family Practice Residency Training in Geriatric Medicine." 7/1/96 – 6/30/00, $6,000/year. L.G. Lipson, M.D., Director.

31. Research Grant from G.D. Searle and Co. ' "Controlled Onset Verapamil Investigation of Cardiovascular Endpoints." 5/97 through 5/02. $75.000. L.G. Lipson, M.D., P.I.

32. State of Alaska, "Training in Geropharmacy, Fall Prevention, and Quality Assurance in the frail and demented elderly." 4/98- 1/1/02, $200,000. L.G. Lipson, M.D., P.I.

33. Research Grant from Pfizer Pharmaceuticals, - "Studies in Fine Motor Coordination in Alzheimer's Disease." 6/98-10/99, $97,000. L.G. Lipson, M.D., P.I.

34. Research Grant from the Keck Foundation "Studies on the Use of Medications in the Elderly." 9/30/02, $4,000. L.G. Lipson, M.D., P.I.- 12/31/02.

35. State of Alaska, "Training in Geropharmacy: Quality Assurance in the Frail and Demented Elderly: CQI of Pioneers' Homes," 1/1/02-12/31/02. $100,000. L.G. Lipson, M.D., P.I.

36. State of Alaska, "Training in Quality Assurance of the Frail and Demented Elderly: CQI of Pioneers' Homes," 1/1/03-12/21/03. $100,000 L.G. Lipson, M.D., P.I.

37. State of Alaska – University of Alaska. Alaska Geriatric Education Center – Consultant 7/1/03 – 12/31/04. $18,000.

38. State of Alaska – University of Alaska, Alaska Geriatric Education Center – Consultant 10/1/07 – 6/30/08. $10,000.

39. State of Alaska – University of Alaska, Alaska Geriatric Education Center – Consultant 7/1/08 – 6/30/09. $10,000.

44

# EXHIBIT 1

NO. C-1-PB-12-001625

| IN THE GUARDIANSHIP OF | § | IN THE PROBATE COURT NO. 1 |
|---|---|---|
| MARY RIVERA, | § | OF |
| AN INCAPACITATED PERSON | § | TRAVIS COUNTY, TEXAS |

FILED FOR RECORD 2013 JUN 20 PM 12: 15 DANA DEBEAUVOIR COUNTY CLERK TRAVIS COUNTY, TEX.

## ORDER APPOINTING PERMANENT GUARDIAN OF THE PERSON WITH FULL AUTHORITY

On this day, the Court heard the *Application for Appointment of Permanent Guardian of the Person and Estate with Full Authority* of Mary Rivera, filed in this proceeding by Martha Mahan. Martha Mahan appeared in person and through her attorney of record, Vivian Ross-Bennett. The Court finds that Mary Rivera, the ward, appeared through her attorney ad litem, Kathleen Ford Bay.

In accordance with § 684 of the Texas Probate Code, the Court finds:

a. by clear and convincing evidence that:

1. Mary Rivera is a totally incapacitated person without capacity to care for herself, to operate a motor vehicle, and to vote in a public election;

2. it is in the best interests of Mary Rivera to have a permanent guardian of the person with full authority; and

3. the rights of Mary Rivera will be protected by the appointment of a guardian.

b. by a preponderance of the evidence that:

1. this Court has venue and jurisdiction of this proceeding and of all necessary parties, and that citation and notice have been given in the manner and for the length of time required by law;

2. Martha Mahan is eligible to act as guardian, is entitled to be appointed as such and is not disqualified by law;

3. Mary Rivera is a totally incapacitated person as indicated by her mental and physical limitations and as evidenced by recurring acts within the preceding six months and continuing to this date; and

4. Martha Mahan has acted in good faith in the filing and prosecution of the application for guardianship.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by this Court that Martha Mahan is appointed permanent guardian of the person with full authority of Mary Rivera, the ward, and shall exercise all the powers, rights and duties, both general and specific, that are given to a guardian of the person in Chapter XIII of the Texas Probate Code, subject to further orders of this Court. The powers granted to the guardian by this order specifically include, but are not limited to:

(1) the right to establish the ward's legal domicile, except that the ward shall not be removed from her current residence at Gracy Woods I Nursing Center until further order of this Court;

(2) the power to arrange for the ward's food and housing needs;

(3) the power to apply for, to arrange, and to consent to any and all medical and dental care, including but not limited to medical tests, examinations, and the administration of medication, as required and needed by the ward;

(4) the power to apply for, to arrange and to consent to any and all psychological tests and evaluations which may be needed by the ward, other than the inpatient psychiatric commitment of the ward;

 I, Dana DeBeauvoir County Clerk, Travis County, Texas do hereby certify, that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

Dana DeBeauvoir, County Clerk
By Deputy


0002 64208

(5) the power to apply to and receive funds from state or federal government sources for the ward's benefit;

(6) the power to apply for and secure governmental services for the ward;

(7) the power to apply for and to secure an identification card for the ward;

(8) the power to execute all documents necessary to facilitate employment; and

(9) the power to consent to the disclosure of the ward's confidential records.

IT IS FURTHER ORDERED that the guardian of the person shall not prevent the ward's family members from visiting the ward subject to further order of this Court, and that the guardian of the person shall execute the necessary documents to grant family members access to the ward's medical records.

**IT IS FURTHER ORDERED that Mary Rivera will no longer have the right to:**
**1) vote in a public election;**
**2) own, possess, or purchase a firearm; and**
**3) hold or obtain a license to operate a motor vehicle under Chapter 521 of the Texas Transportation Code.**

IT IS FURTHER ORDERED that the Clerk of the Court shall prepare and transmit an abstract of judgment for this proceeding to the Travis County Voter Registrar and to the Texas Department of Public Safety.

IT IS FURTHER ORDERED that the clerk of the Court shall report to the Texas Department of Public Safety pursuant to Texas Government Code §§ 411.052 and 411.0521.

IT IS FURTHER ORDERED that Martha Mahan post a corporate surety bond in the amount of $ 13,000.00 in the time required by law.

IT IS FURTHER ORDERED that this Order does not constitute authority for Martha Mahan, the guardian of the person, to act as guardian until she has qualified according to law by filing an oath with the Travis County Clerk's office, posting the required corporate surety bond, and having the bond approved by the Judge. Upon her qualification as guardian, the Travis County Clerk will issue Letters of Guardianship, with a certified copy of this Order attached, that WILL BE EVIDENCE TO ALL CONCERNED of Martha Mahan's authority to act as guardian of the person of the ward, and that the letters of guardianship will expire one year and four months after the guardian's date of qualification unless renewed according to law.

IT IS FURTHER ORDERED that within 12 months from the date of her qualification, and annually thereafter, Martha Mahan will submit to the Court an annual report of the person.

~~IT IS FURTHER ORDERED that Kathleen Ford Bay, attorney ad litem representing the interests of the ward, is awarded the amount of $ _____ for reasonable and necessary services as attorney ad litem, to be taxed as costs and paid by Travis County pursuant to Texas Probate Code § 665A, and is hereby discharged.~~

IT IS FURTHER ORDERED that the term of this guardianship shall be until the ward is restored to full capacity, dies, or until the Court determines this matter shall be terminated.

SIGNED the 20 day of June 2013.

**Recommended**
This 20 day of June , 2013.

Dan Prashner, Associate Judge

GUY HERMAN, PRESIDING JUDGE

2

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

Dana DeBeauvoir, County Clerk

By Deputy

# LETTERS OF GUARDIANSHIP

C-1-PB-12-001625

GUARDIANSHIP OF
**MARY RIVERA,**
An Incapacitated Person

PROBATE COURT NUMBER ONE
TRAVIS COUNTY, TEXAS

**THE STATE OF TEXAS**
**COUNTY OF TRAVIS**

I the undersigned Clerk of the Probate Court Number One of Travis County, Texas, do hereby certify that on **June 20, 2013**, **MARTHA MAHAN** was duly appointed by said Court, Guardian of the Person with Full Authority of **MARY RIVERA, an incapacitated Person** and granted certain specific powers as set forth in the attached copy of the order of appointment.

I further certify that said **MARTHA MAHAN** qualified as such Guardian on **July 18, 2013,** as the law requires, and the authority under the letters expires on **November 18, 2014.**

GIVEN UNDER MY HAND AND THE SEAL OF SAID COURT at office in Austin, Texas, this **July 19, 2013**

Dana DeBeauvoir
County Clerk, Travis County, Texas
P.O. Box 149325 Austin, Texas 78714-9325

By Deputy

O. RUIZ

23P - 000005030
C-1-PB-12-001625

# EXHIBIT 2

# AFFIDAVIT OF MARTHA MAHAN

COUNTY OF WILLIAMSON      §
                                        §

STATE OF TEXAS                §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Martha Mahan, who being by me duly sworn on his oath and said the following:

1.      "My name is Martha Mahan. I am over the age of eighteen years, of sound mind, have never been convicted of a crime of moral turpitude, and competent to testify. I have personal knowledge of the facts stated herein and they are true and correct. I am authorized to make this affidavit.

2.      I am the daughter of Mary Rivera. At all relevant times, I was the legal guardian of my mother.

3.      On a number of occasions during the Friday afternoon happy hours at the nursing home, another resident made inappropriate statements and inappropriately touched my mother. I complained to the management about these concerns. The nurses caring for my mother were aware of this problem.

4.      I often visited my mother in the hours between 11:00 p.m. and 6:00 a.m. I did so many times in the months before I removed her from the facility. I would sit with her sometimes for several hours. The staff never came into her room or checked on my mother during these visits. Indeed, I rarely saw staff in the hallways during these visits.

5.      Around 6:00 a.m., early on Saturday morning on the 9th of November, I arrived at my mother's room. My mother was in obvious distress. She was crying and more confused than usual.

1

6.     I noticed that there were broken Christmas ornaments on the floor and I wondered if she had fallen. I took her to the bathroom, as I usually did, and she seemed to be in pain. When she urinated she did so standing up which was very unusual. I put her back in her bed and then went to use the bathroom myself. When I went to throw some paper towels in the trash, I noticed a whole stack of wet and bloody rags.

7.     Concerned my mother was hurt, I took the rags to Wendy, the charge nurse. Wendy did a skin assessment of my mom while I watched and did not find any cuts or open wounds.

8.     I decided to take my mom to the hospital. We went to Seton Hospital – Williamson County and they found mom had some bruising to her back. They did not do any type of vaginal exam.

9.     I began to worry my mother was the victim of a sexual assault. The police were contacted and I ultimately took her to St. David's Hospital. During the whole time my mother was acting strange – like someone had hurt her. She would flinch like someone who was afraid or who had been hit.

10.     At St. David's, a nurse did a vaginal exam on my mother. She told me my mom had vaginal injuries. I took my mom out of the nursing home and back to my house. My mom continued to act like she was afraid of something. This continued until she died.

FURTHER AFFIANT SAYETH NOT."

2

SIGNED this the _11th_ day of December, 2014.

_Martha Mahan_
Martha Mahan

SUBSCRIBED AND SWORN TO this the _11th_ day of December, 2014.

JEANNIE A DUBBEL
My Commission Expires
June 25, 2016

_Jeannie Dubbel_
Notary Public, In and For the State of Texas

3

# EXHIBIT 3

RIVERA,MARY DELAROSA              ER
Acct#: L00071683103 M/R#: L001022503
Loc:L,ER                    ▮▮▮▮ /F
Dr: CAPITOL EMERGENCY AS1771713

# EVIDENCE
## CHAIN OF CUSTODY

Offense # B-314743

Charge(s)

Property Storage Location SAWE-A

| | RELEASED BY: | EMPLOYEE # | DATE | TIME |
|---|---|---|---|---|
| 1. | [signature] RN SAWE-A | | 11-12-13 | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

(PD-0015)                                    REV 01/09

APPENDIX 1

77

# Discharge Instructions

## MEDICATIONS (Preventative medications you received are checked below.)

_____ **Plan B:** 1 pill, 1.5 milligrams, given to prevent pregnancy

_____ **Zithromax:** 4 pills, 1gram, given to prevent chlamydia, a sexually transmitted infection

_____ **Rocephin:** 1 shot, 250 milligrams, given to prevent gonorrhea, a sexually transmitted infection

_____ **Flagyl:** 4 pills, 2 grams, given to prevent trichomonas, a sexually transmitted infection

**If you received Flagyl to take at home, take all 4 pills by mouth after eating on _____**

**Do not consume alcohol for 24 hours before and 48 hours after taking the pills.**

Abstain from unprotected sexual contact until medications are completed.

## Additional Information: _____

## FOLLOW-UP (Your recommendations are checked below.)

### IMMEDIATE

_____ **Prescription antibiotics** If you chose to receive a prescription for antibiotics, fill these prescriptions soon as possible and take the medications according to their instructions.

__✓__ **SafePlace** (267-SAFE) offers free and confidential services to women, men and children who ha experienced sexual assault and/or domestic violence.

__✓__ **Victims Services** at the Austin Police Department (512-974-5037) and Travis County Sheriff's Offi (512-854-9709) can provide assistance regarding personal safety, your rights as a victim of crime, informati about the investigation, counseling, referrals to helpful resources, assistance with Crime Victim Compensation applications, and emotional support throughout the criminal justice process.

### WITHIN ONE WEEK

__✓__ **HIV and syphilis baseline tests** can be done by a physician, clinic, Planned Parenthood, the cit sexually transmitted infection clinic (15 Waller Street, 972-5430), and People's Clinic (2909 N. IH-35, 478-493 Additional locations can be found by calling the Texas Health and Human Services Department (211).

### ONE TO TWO WEEKS

__✓__ **Sexually transmitted infection tests** If you did not take preventative medications, you can be test for chlamydia, gonorrhea and trichomonas at the same locations listed above.

### THREE WEEKS

_____ **Pregnancy test** If pregnancy is possible, testing is recommended to be sure the preventative medici you took worked or to test for pregnancy if you chose not to take preventative medicine.

### SIX WEEKS

__✓__ **Repeat HIV and syphilis tests**

### THREE MONTHS

__✓__ **Repeat HIV and syphilis tests**

__✓__ **Sexually transmitted infection tests** Tests for chlamydia, gonorrhea and trichomonas are recommended to be sure the preventative medication you took worked.

### SIX MONTHS

__✓__ **Repeat HIV and syphilis tests**

RIVERA, MARY DELAROSA          ER
Acct#: L00071683103 M/R#: L001022503
Loc:L.ER                              /F
Dr: CEA                    11/12/13

### OTHER:

1. If there is an indictment made related to your case you have the legal right to request the results of an assaila HIV test.
2. If you have questions about which collected evidence items were tested and testing results, please contact law enforcement.

Signature _(signature)_

Examiner's signature: _(signature)_

# Discharge Summary
## St. David's Medical Center
919 E 32nd St, Austin, TX 78705 512-544-4240
11/12/2013 11:15

---

### Patient: RIVERA, MARY DELAROSA

███████████████████████████

**MRN: L001022503   Acct#: L00071683103**
**Sex: F   DOB:** ████████   **Age:** ███ ·

Thank you for visiting the St. David's Medical Center-Emergency Department.
You have been evaluated today by Goertz, Frederick, M.D. for the following condition(s):

Sexual assault (CONSIDERATION OF ASSAULT).


## INSTRUCTIONS
(FOLLOW SANE NURSE'S RECOMMENDATION).


**Warnings:** GENERAL WARNINGS: Return or contact your physician immediately if your condition
worsens or changes unexpectedly, if not improving as expected, or if other problems arise.

Understanding of the discharge instructions verbalized by patient.


**You have been given the following additional information:**
SEXUAL ASSAULT Exam        [Adult]


_Patient Signature_                  (Guardians)

_11/12/2013_    Hospital Representative                    _____


Medical Records Copy

# Discharge Summary with ExitWriter
## St. David's Medical Center
919 E 32nd St, Austin, TX 78705 512-544-4240
11/12/2013 11:15

---

### Patient: RIVERA, MARY DELAROSA
██████ █████ ████████████
MRN: L001022503    Acct#: L00071683103
Sex: F ████ ████████ ████████

Thank you for visiting the St. David's Medical Center-Emergency Department.
You have been evaluated today by Goertz, Frederick, M.D. for the following condition(s):

Sexual assault (CONSIDERATION OF ASSAULT).

**INSTRUCTIONS**
(FOLLOW SANE NURSE'S RECOMMENDATION).

**Warnings:** GENERAL WARNINGS: Return or contact your physician immediately if your condition worsens or changes unexpectedly, if not improving as expected, or if other problems arise.

Understanding of the discharge instructions verbalized by patient.

## ADDITIONAL INFORMATION

**SEXUAL ASSAULT Exam** [Adult]

You have had an exam today because of a sexual assault. The purpose of this exam is to:
-- Find out if you have any injuries that need treatment
-- Offer treatment to prevent gonorrhea and chlamydia infections (common sexually transmitted diseases)
-- Offer treatment to prevent HIV infection
-- Offer treatment to prevent pregnancy
-- Arrange for follow-up counseling
-- Collect specimens (which will be turned over to the law enforcement agency)
-- Answer any questions that you might have

After a sexual assault, it is normal to have many strong and unexpected feelings. Shock, embarrassment, fear depression, blame, guilt, shame and anger are all very common and normal feelings. There may also be:

-- General sense of anxiety and fear
-- Recurring thoughts or nightmares about the event
-- Trouble sleeping or changes in appetite
-- Feeling depressed, sad or low in energy
-- Irritable or easily upset
-- Feeling the need to avoid activities, places or people that remind you of the event

These are normal reactions and usually go away within a few days or a few weeks.

APPENDIX 1
80

## HOME CARE:

1) For the next few days, you may prefer to stay with family or a friend. This will help give you emotional support and a sense of physical safety.

2) Sexual assault is a crime of violence. Remember that it was NOT YOUR FAULT.

3) A sexual assault can affect your self-esteem. It can also affect relationships with partners, family members and friends. Talking with a counselor who understands these issues may be helpful to you. Sometimes, months or years after the assault, feelings may come to the surface again. Counseling or a support group can be helpful at these times too.

4) Many states require your doctor to tell a law enforcement agency when they treat a victim of a violent crime This does not mean that you have to prosecute or go to trial. However, if you decide to prosecute, the evidence taken today will be useful in support of your case.

5) You may be able to receive compensation for medical costs or losses that relate to the sexual assault. Talk to your counselor or the local law enforcement agency for details.

**FOLLOW UP** with your doctor for continued medical care. If emotional or mental symptoms last more than 3 weeks, you may have a more serious traumatic stress reaction. Follow up with the counselor or agency we referred you to for emotional support. There are treatments that can help.

**GET PROMPT MEDICAL ATTENTION** if any of the following occur:
-- Redness, swelling or increasing pain in any injured area
-- Vaginal discharge or unexpected bleeding
-- Lower abdominal (pelvic) pain
-- Fever over 100.0° F (37.8° C) without an obvious cause
-- Pain or burning with urination

Please make an appointment for further treatment as instructed.  Be sure to tell your referral doctor or clinic that we have sent you, and take your medicines and instructions to the office.  If you had x-rays, an EKG, or lab tests today, they have been reviewed by your doctor.  We will contact you at once if other important findings are noted after further review by our staff.  If you do not continue to improve or if your condition worsens, we request you to please call your doctor or the emergency department right away so you can be examined.CULTURE REPORTS -- If you had cultures drawn: You will be notified of your culture only if further treatment is recommended by the ED Physician.  You may obtain a copy of your culture results from our medical records department Monday - Friday 8:30am - 5:00pm.  The phone number is 512-544-4280.  X-Rays -- If you have received any radiology testing today, please note that the x-ray has been read by your ED physician.  A final reading by a Radiologist will be completed and you will be notified by the Emergency Department staff of any additional findings.  If you need a copy of your x-ray for your follow-up appointment, please call 512-544-4280 to have films ready for pickup.

**THINGS WE THINK YOU SHOULD KNOW ABOUT YOUR HEALTH:**

## SMOKING CESSATION:

Smoking is related to many diseases including Pneumonia, Bronchitis, Emphysema, Various Cancers, Heart Attack, and Stroke. If you are a smoker, we encourage you to quit. There are many methods to help you quit. Please discuss these options with your primary care physician, your clinic, or go online to the American Lung Association at www.lungusa.org and double click the Quit Smoking icon in the tabs at the top of the page.

## IMMUNIZATIONS:

Vaccines are available for vaccine preventable diseases including Hepatitis A and B, Diphtheria, Tetanus, Pertusis, Haemophilus Influenzae, Polio, Measles, Mumps, Rubella, Varicella (chicken Pox), Pneumococcal and Influenza. It is important to keep children up to date on their immunization schedule to help prevent the spread of these diseases. If you have children, please discuss their immunization schedule with the child's primary care physician or clinic. If you are in Williamson County call 512-930-4386; or in Travis County call 512-972-5400 for more information.

## ABUSE:

No one deserves physical or emotional abuse. If you are the victim of abuse; either physical, sexual, or psychological, help is available. Please discuss any concerns you have with your ED physician, your primary care physician, or your clinic. Safe Place is an organization with the sole purpose of assisting those affected by domestic abuse and violence. Please call their hotline at 512-267-7233 (267-SAFE) or online to www.austin-safeplace.org.

## SEAT BELTS:

Seat belts save lives. Each percentage-point increase in safety belt use represents 2.8 million more people buckling up, 250 more lives saved, and 6,400 serious injuries prevented annually. We encourage everyone to use your safety belt correctly and restrain children appropriately. Please go to www.rntsa.dot.gov for more information.

## FOLLOW UP:

If you are unable to make a follow-up appointment with the referral physician or do not have a family physician, you may be able to receive follow-up care at one of the following clinics. Many of the clinics listed accept Medicare, Medicaid, MAP card, or base the fees for services on your ability to pay.

### NORTH AUSTIN

North Austin Health Center                Northwest Rural

APPENDIX 1

82

7112 Ed Bluestein Blvd.

Suite #155

972-4622

18649 Hwy. 1431

Jonestown, TX

All services, all ages

St. Johns Community Center

Community Health Center

7500 Blessing Avenue

Suite 30

972-5185

North Rural

15803 Windermere

Pflugerville

251-4168

**Need a Doctor?**

St. David's Physician

Referral Line 478-3627

For patients with Medicaid/Medicare and Private Insurance

## SOUTH / CENTRAL AUSTIN

El Buen Samaritano

1919 S. 1st St.

Well Women's Health available

Immunizations - Tues - 5-7pm (Children)

South Austin Clinic

2529 S. 1st St.

972-4722

All Services

South Rural Center Clinic

3518 FM 973 South

Del Valle, TX

247-4407

Austin General Medical

1701 East 7th St.

473-2222

APPENDIX 1

83

Seton McCarthy East Clinic

2811 East 2nd St.

389-1498  All ages (fees based upon ability to pay)


## CENTRAL / EAST AUSTIN


Blackstock Health Center

1313 W. Red River Suite 101

324-8600

Well child care, medical, minor surgical

GYN, Prenatal Care, Adolescent


Rosewood Zaragosa

2808 Webberville Road

972-4792

All ages, Medicaid, or MAP card


East Austin Community Health Center

211 Comal St.

972-4322

All services, all ages


STD Clinic

15 Waller St.

972-5430


East Rural Community Health Center

600 West Carrie Manor

Manor, TX  -  272-5561

Immunizations, family practice, maternity, AIDS testing (MAP card only)

# OrderSheet

## ORDER SHEET

**Weight:** 100.2 kg (stated)

**Allergies:** No Known Drug Allergy

**GENERAL ORDERS:**
 -- (Medical forensic exam per protoc9ol. APD case # 13-3140743. Detective Stewart.) (13:53 11/12/2013     JBlack R.N. verbal order read back to  FGoertz M.D.) (13:58 JBlack R.N.)

**MEDICATION ORDERS:**

**IV FLUIDS:**

**ORDER SHEET NOTES:**


This document has not been locked and should not be saved in the medical record.

---

**Patient: RIVERA, MARY DELAROSA**
MRN: Q56545
VisitID: L00071683103
78y, F, ███████

OrderSheet
St. David's Medical Center
919 E 32nd St, Austin, TX 78705 512-544-4240
Registration Date/Time: 11/12/2013 14:20

**PART A - PATIENT INFORMATION - PLEASE COMPLETE PART A AND PART B**

Today's Date: 11 / 12 / 13   Have you received care at this Facility Before? ☐ Yes ☐ No

I came to the Emergency Department today because: _Safe exam_

TIME STAMP (Facility Use Only)

1118

Last Name: _Rivera_   First Name: _Mary_   Middle Initial: _____

Address: ██████████████████████ _TX 76574_

(Number/Street) ███████ (City) (State) (Zip Code) Date of Birth: ██████

Phone ███████████ Soc Sec Number: _____-___-_____ Family Physician: _____

**FOR FEMALE PATIENTS ONLY:** Are you pregnant? ☐ Yes ☑ No

Last menstrual period: _____/_____/_____   Have you had a baby within the past six weeks? ☐ Yes ☑ No

Form completed by: ☐ Self ☑ Other: _Daughter_   Relationship: _____

**PART B - CURRENT SYMPTOMS**

**Please check any of the following symptoms you currently have:**

☐ Persistent cough greater than 3 weeks       ☑ Sore Throat
☐ Fever greater than 100.4°F                   ☑ Body aches
☐ Night Sweats                                 ☐ Cough (not related to allergies or COPD)
☐ Cough with blood production                  ☐ Rash
☐ Fatigue                                      ☐ Nasal congestion (not related to allergies or sinus infections)
☐ History of TB or Positive TB Skin Test       ☐ Close contact with person who has influenza-like illness
☐ Close contact with person who has TB         ☐ Unexplained weight loss

**PART C - TRIAGE INFORMATION (For Facility Use Only)**   _Sunday_

| 1st Call for Triage at: | 2nd Call for Triage at: | 3rd Call for Triage at: | 4th Call for Triage at: |
|---|---|---|---|
| _____:_____ AM PM | _____:_____ AM PM | _____:_____ AM PM | _____:_____ AM PM |

Triage Nurse Notes: _Grance woody off of metric. pain = incont. early Friday Went to ED Daughter found fresh blood in trash can. Hx Dementia_

**PART D - RAPID (INITIAL) TRIAGE (For Facility Use Only)**

Time: _____   First Point of Contact Screening Positive: ☐ Y ☐ N   Patient requested to mask? ☐ Y ☐ N

AIRWAY: ☐ Patent ☐ Impaired   **BREATHING - Respiratory Distress:** ☐ None ☐ Mild ☐ Moderate ☐ Severe

CIRCULATION: ☐ Warm/Dry/Normal Color ☐ Pale ☐ Diaphoretic   _Scette, White year._

Pulse Rate: ☐ WNL ☐ Rapid   Capillary Refill: ☐ < 2 seconds ☐ > 2 seconds

DEFORMITY/DISABILITY - Loss of Consciousness: ☐ Yes ☐ No ☐ No Neuro Deficits ☐ Neuro Changes

Extremity: Neurovascular Integrity Intact: ☐ Yes ☐ No ☐ N/A

CHIEF COMPLAINT: _____

**TRIAGE ACUITY:**  1 Resuscitation    2 Emergent    3 Urgent    4 Semi Urgent    5 Non Urgent

DISPOSITION: ☐ Immediate Bed ☐ Stable - To Waiting Area after Instructions

Comments: _Officer Jones 512 974-4456_

Triage Nurse Signature: _____

_141/72_          _Taylor APD 512-365-27_

*EDPRS*

**Sign-In Sheet for Emergency Services**

T3107BC (Rev. 7/12)

_50_
_95/RA_
_982_

RIVERA, MARY DELAROSA        ER
Acct#: L00071683103 M/R#: L001022503
Loc: L.ER                    8 /F
Dr: CEA                      11/12/13

APPENDIX 1

Page 86 of

| PATIENT INFORMATION | FOR OFFICE USE ONLY | |
|---|---|---|
| **PATIENT'S NAME:** Martha Mahan | **MR No.:** | **ACCT No.:** |
| **ADDRESS 1:** ▮▮▮▮ ▮▮▮ ▮ ▮ ▮ | **DOS:** | **LOCATION** |
| **ADDRESS 2:** | **COMMENTS/COMPLETION DATE:** | |

| CITY, STATE, ZIP: Taylor TX 76574 | FACILITY FROM WHICH PHI WILL BE RELEASED *(Check all that apply)* | DATES OF SERVICE |
|---|---|---|
| **BIRTH DATE:** ▮/▮▮/▮▮ | ✓ St. David's Hospital | 11-12-13 |
| **SOCIAL SECURITY NO.:** (Optional) | St. David's Rehabilitation Center | |
| **CONTACT NUMBERS:** ▮▮ ▮ ▮▮ | St. David's Georgetown Hospital | |
| | Other | |

| FACILITY/PERSON TO WHOM PHI WILL BE RELEASED/DISCLOSED: | PURPOSE OF DISCLOSURE: *(Note: ** Indicates Fee for Copies)* |
|---|---|
| **NAME:** Austin Police | Follow Up Care |
| **ADDRESS 1:** | Insurance** |
| | Attorney** |
| **ADDRESS 2:** | Personal Use** |
| **CITY, STATE, ZIP:** | ✓ Other** Please Explain  Legal |
| | **METHOD OF RELEASE/DISCLOSURE:** |
| **CONTACT NUMBERS:** | ☐ Fax (Emergency Only)  Fax Number ___  ☐ Mail  ☑ Other  Pickup |

**INFORMATION TO BE USED/DISCLOSED:** *(Check all that apply)*

Is this request for psychotherapy notes? ☐ Yes, then this is the only item you may request on this authorization. You must submit another authorization for other items below. ☐ No, then you may check as many items below as you need.

| | | | |
|---|---|---|---|
| ☐ Pertinent Package | ☐ EKG, EEG, EMG | ☐ Pathology Slides | ☐ Psychiatric Evaluations/Tests |
| ☐ Front Sheet | ☐ Laboratory Report | ☐ Physician Orders | ☐ Infectious Disease (Including HIV Test Results) |
| ☐ Discharge Summary | ☐ ER Information | ☐ Progress Notes | ☐ Consultations |
| ☐ History/Physical | ☐ Imaging Reports (X-rays, CTs, MRIs) | ☐ Nursing Information | ☑ Complete Copy |
| ☐ Operative Report/Procedure | ☐ Imaging Films | ☐ Medication Records | ☐ Immunization Record |
| ☐ Cath Lab | ☐ Pathology Report | ☐ Therapy Notes | ☑ Other: Forensics |

*I understand that:*

1. I may refuse to sign this authorization and that it is strictly voluntary.
2. My treatment, payment, enrollment or eligibility for benefits may not be conditioned on signing this authorization.
3. Medical Information is considered Protected Health Information (PHI) under both Federal and State Privacy Laws.
4. Unless otherwise specified, this authorization shall expire 180 days from the date of my signature, OR from the date of discharge, whichever is later. (Otherwise specified date _____ )
5. I acknowledge, and hereby consent to such, that the released information may contain alcohol, drug abuse, psychiatric, HIV testing, HIV results or AIDS information.
6. A facility may not condition the provision of treatment to an individual on signing an authorization except for:
    1. Research-related treatment; and
    2. Health care that is solely for the purpose of creating information for disclosure to a third party.
7. I may revoke an authorization in writing except to the extent that:
    1. The facility has taken action prior to receiving the revocation; or
    2. If an authorization was obtained as a condition of obtaining insurance coverage.
    Further details may be found in the Notice of Privacy Practices.
8. If the requester or receiver is not a health plan or health care provider, the released information may no longer be protected by federal privacy regulations and may be redisclosed.
9. I understand that I may see and obtain a copy of the information described on this form, for a reasonable copy fee, if I ask for it. There is a fee for copy services rendered.
10. I will receive a copy of this form after I sign it.

**SIGNATURES**

*I have read the above and authorize the disclosure of the protected health information as stated.*

| Signature of Patient or Authorized Party: Martha Mahan | Date: 11/12/13 |
|---|---|
| Witness (if applicable): (guardian) | Witness (if Applicable): |
| Print Name of Patient or Authorized Party: | Relationship to Patient: |

**St David's | MEDICAL CENTER**

## Authorization for Release of Protected Health Information

RIVERA,MARY DELAROSA          ER
Acct#: L00071683103M/R#: L001022503
Loc:L.ER                            /F
Dr: CEA                11/12/13

---

**Patient: RIVERA, MARY DELAROSA**
URN: Q56545   MRN: L001022503   Acct#: L00071683103
Sex: F   DOB: ▮▮▮▮   Age: ▮

***This is a preliminary document and is subject to change**

## TRIAGE

Triage time 11:43.  Acuity: LEVEL 2.
Chief Complaint: STATED POSSIBLE PHYSICAL and SEXUAL ASSAULT (Pt. took her Mom to the ER or Friday and Scott and White yesterday for gyn exam.  This did not happen.  Pt.'s daughter filed a police report.  She said the case was approved and hour ago by Officer Flores.  They do not have case number or badge number.).
BP: 141 / 72.  HR: 50.  RR: 20.  Temp: 98.2 oral.  O2 saturation: room air -95 percent.  Alert.  Glasgow Coma Scale- eyes open spontaneously (4); best verbal response- disoriented (4); best motor response- obeys commands (6).  No acute distress.  --11:57 Ritschard, Heather, R.N..
Weight: 100.2 kg stated. Height: 57 inches Per Patient. BMI: 47.9. --11:56 11/12/2013Heather Ritschard, R.N..

### Medications
Daughter does not have med list.  She will attempt to get them. --1155 (11/12/13) Heather Ritschard, R.N..

### Allergies
No Known Drug Allergy. --1155 (11/12/13) Heather Ritschard, R.N..

### History
This occurred just prior to arrival (Friday).  Police department notified (APD called in triage.  Pt.'s daughter reports she made the report on Sunday and it was not approved for lack of evidence.  Det. Flores approved case this am.  Daughter can not find case/ badge number.).  Pain level now: 0/10.

PAST MEDICAL HX: Hypertension.  Diabetes mellitus.  Immunizations: up-to-date.  (Dementia, KD failure stage 3. UTI.  CHF).

SURGERY HX: Back surgery.  Cataract surgery on the right eye.  Hernia repair has been performed three times.
SOCIAL HX: Nonsmoker.  No alcohol use.  A potential harm assessment was performed. The patient answered "no" to the question "Are you here because you tried to hurt yourself?", "Have you ever tried to hurt yourself before today?", "Have you recently had thoughts about killing yourself?" and "Have you recently had thoughts about harming or killing others?".  Functional assessment: no impairments noted.  The nutritional risk assessment revealed no deficiencies.  No report of abuse.  No infectious disease exposure.

Patient: RIVERA, MARY DELAROS/
URN: Q56545   Acct#: L0007168310:
Sex: F  DOB: ▮▮▮▮   11/12/201:
1 of .

APPENDIX 1
88

Historian: patient. Primary physician (Dr. Choen. Dr. Router for nephrology.).   --11:57 Ritschard, Heather R.N.

(Case # 133140743  Detective Stewart  Badge # 6301 APD).   --12:00 Doug Cargill, R.N..

**Interventions**
ID band on patient. To room.   --11:57 Ritschard, Heather, R.N..

## PHYSICAL ASSESSMENT
12:04. Alert. Appears in no acute distress. Affect appears normal. Glasgow Coma Scale: 14- eyes open spontaneously (4); best verbal response- disoriented (4) ; best motor response- obeys commands (6). Revised trauma score: 12. Pupils equal, round and reactive to light. Respirations not labored. Normal heart rate and rhythm. Pulses within normal limits. Capillary refill less than 2 seconds. Extremities exhibit normal ROM. Neuro-vascular status intact to the extremity. Skin is warm and dry.   --12:04 Caroline Doyle, R.N..

## NURSING PROGRESS NOTES
12:04. Two patient identifiers checked. The initial plan of care for this patient includes an assessment with efforts to address the patient's anxiety, fear, grief and anger; comfort measures; impairment of the genitourinary system; therapeutic needs of the patient as indicated by complaint specific guidelines; referrals, additional testing and hospital admission; educational needs of the patient and family regarding the patient's medications and disease process and available services and resources. This plan of care was discussed with the patient and family. Call light placed in reach. Side rails up x 2. Bed placed in lowest position. Brakes of bed on.   --12:04 Caroline Doyle, R.N.

12:04. (Approval received. Jenny, FEC R.N. called . Safe place called.).   --12:06 Ritschard, Heather, R.N.

12:50. (SANe arrived. Patient medically cleared for medical forensic exam by Dr. Goertz. Introduced self to patient, guardian and family. Plan of care for medical forensic exam discussed, questions elicited and answered. Guardian verbalized understanding of plan and consents. Consents signed. Guradian declines prophylactic medications for patient, prefers to do testing and treat if necessary later. Guardian states patient is current on tetanus and hepatitis b vaccines.).   --13:38 Jenny Black, R.N.

13:00. Patient ID band checked for patient name and birthdate: patient confirmed. Blood samples drawn from the right antecubital space with Vacutainer and 23g butterfly by nurse per protocol ; labeled in presence of the patient and held: purple and gray top.   --13:38 Jenny Black, R.N.

13:46. (Safe Place advocate arrived.).   --13:46 Jenny Black, R.N.

13:53. The patient reports no complaints and the patient is calm and resting quietly. Patient reports current pain level as 0/10.   --13:53 Jenny Black, R.N.

14:39. BP: 147/67 lying. HR: 53. RR: 18. Temp. Patient ID band checked for patient name and birthdate: patient confirmed. Urine collected with return of yellow-colored clear urine. Specimen labeled in the presence of the patient. (Patient ambulated to bathroom and room 17 with walker.).   --14:39 Jenny Black, R.N.

/ 15:09. Pelvic exam performed by SANE. Preparation: sexual assault evidence kit (applicable consents obtained). Procedure: sexual assault exam per protocol. Specimens collected and sent to lab: sexual assault evidence kit sealed/signed and placed in lockbox per protocol. Status post-procedure: the patient was stable and no complications were noted. Total time of assist / procedure:>90 minutes.   --15:09 Jenn Black, R.N.

APPENDIX 1

15:10. Reassessment after procedure. The patient reports no complaints and the patient is calm and resting quietly. Patient reports current pain level as 0/10. Overall patient status is improved- the patient states feels better. ED physician notified about patient's status. --15:10 Jenny Black, R.N.

15:26. (APD VS here with patient and family. APS referenence number 64190731. APD VS is working with guardian to move patient to a different nursing home. If that is not possible, APD VS will contact current nursing home to assure patient's safety there.). --15:26 Jenny Black, R.N..

**Assault / Forensic Flowsheet**
15:09. The patient has family for support. Personal safety plan, reporting plans, STD and contraceptive prophylaxis, need for medical follow-up, counseling, coping/fear reduction and interventions/services discussed with patient. The patient has been given education and resource materials. --15:09 Jenny Black, R.N..

**DISPOSITION / DISCHARGE**
15:28. BP: 165/70 sitting. HR: 90. RR: 18. Temp: deferred. Condition at departure: improved and stable. Patient reports pain level on departure as 0/10. The goals identified in the patient's plan of care were met. The following issues were addressed: psycho-social issues, pain control, comfort issues, nutritional issues, educational issues and follow up care. Fall risk assessment completed. No fall risk identified. No learning barriers present. Discharge instructions provided and reviewed with the patient. Reviewed referral to family practice, a women's shelter, Planned Parenthood, the public health department and crisis hotline for followup and testing. Summary of care provided to family. Patient and family verbalized understanding. Written instructions provided in English. Guardian verbalized understanding. The patient was discharged by the physician. The patient was discharged to the nursing home and accompanied by guardian. The patient left the Emergency Department ambulatory and via private vehicle. Driving (guardian.). --15:28 Jenny Black, R.N.

15:28.
Departure time: 15:28. --15:28 Jenny Black, R.N..
The patient's home medications have been reviewed and validated with patient by the nurse. --15:28 Jenny Black, R.N..

**This report is not final**

# AUSTIN/TRAVIS COUNTY
# SEXUAL ASSAULT NURSE EXAMINERS

## CONSENT FOR MEDICAL FORENSIC EXAMINATION, TREATMENT, AND COLLECTION OF EVIDENCE

1. I hereby authorize _J Black RN SANE CAS4ue_ a sexual assault nurse examiner who is credentialed at St. David's Medical Center to perform a medical forensic examination, treatment and the collection of evidence. _(initial)_

2. I understand that a forensic medical examination for evidence of sexual assault can, with my consent, be conducted by a health care professional to discover and preserve evidence of the assault. I understand that the examination may include the collection of reference specimens at the time of the examination or at a later date. _(initial)_

3. I understand that the collection of evidence may include photographing injuries, and that these photographs may include the genital area. _(initial)_

4. I understand that I may refuse to consent or withdraw my consent at any time for any portion of the examination. I understand that if I refuse consent to any exam procedure, it may result in loss of evidence. _(initial)_

5. I understand that I will not be billed for the evidence collection portion of this examination. I understand that I _will_ be responsible for the payment of any medical treatment and medications to the extent I am not eligible for discounted medical care based on my financial classification and ability to pay. _(initial)_

6. I understand that the collection of evidence may include the collection of blood and urine specimens for toxicology (drug screening). _(initial)_

7. I understand data without patient identity may be collected from this report for health and forensic purposes and provided to health authorities and other qualified persons with a valid educational or scientific interest for demographic and/or epidemiological studies. _(initial)_

8. If conducted, the report of the examination and any evidence obtained will be released to law enforcement authorities. _(initial)_

I certify this form has been fully explained to me, that I have read it or have had it read to me, and that I understand its contents. I hereby consent to a forensic medical examination for evidence of sexual assault. I similarly consent to the examination of minor child(ren) for whom I am the legal guardian.**

I understand that under § 261.101 of the Texas Family Code, St. David's Medical Center, its employees, and/or representatives are required to report suspected or identified child abuse or neglect to the proper authorities.

☐ Patient          ☐ Parent          ☐ Guardian          ☐ Surrogate

_martha m thau_

Signature

_11/12/13_

Date

**If the parent or guardian is not available, the child may be examined for sexual abuse under the Texas Family Code § 32.005.

RIVERA, MARY DELAROSA          ER
Acct#: L00071683103 M/R#: L001022503
Loc:L.ER                          78 /F
Dr: CEA                          11/12/13
APPENDIX
91

**Sexual Assault Forensic Examination Report**

Patient name: **Rivera, Mary**
Case: **13-3140743**
Date of exam: **11/12/2013**
MR #: **1022503**
DOB: ██████

Name of examiner..................Jenny Black, RN, SANE A, CA-SANE
Name of facility...................... St. David's Medical Center
Law enforcement agency....... Austin Police Department
CPS, APS notified..................Yes         4419073l

Beginning time of exam 13:30   Ending time of exam 15:15

**Patient information**
Gender ................. Female
Ethnicity .............. Hispanic
Accompanied by
    Agency or relationship ........ Safe Place Advocate, Family
Present during exam per patient's request....... daughter/guardian
Advocate present during exam ............ No

**Patient action after assault and before exam**
Douched...............................No
Wiped vulva...........................No
Wiped anal area.................... No
Washed............................... Yes
Bathed.................................No
Showered............................. Yes
Urinated.............................. Yes
Defecated............................ Yes
Vomited............................... No
Had food............................. Yes
Had drink............................. Yes
Brushed teeth........................No
Used mouthwash...................No
Changed clothes....................Yes
Smoked................................No
Medications taken.................unknown *(not received from hospital)*
Other.................................... Yes; cleaned dentures

**Information on assault**
Date and time of assault.......unknown, perhaps early 11/8/13
Number of assailants........... unknown
Gender of assailants............Unknown

Black RN SANE-A
_____
Signature of examiner

Patient name: Rivera, Mary
Case: 13-3140743
Date of exam: 11/12/2013
MR #: 1022503
DOB: █████

Austin/Travis County Sexual Assault Nurse Examiners
Sexual Assault Forensic Examination Report

## At time of assault

Condom................................. Unknown
Lubricant............................... Unknown
Contraceptive foam/
    spermicide ......................... Unknown
Assailant injured.....................unknown
Assailant scratched................ unknown
Penetration........................... Anal penetration................... Unknown
.............................................. Vaginal penetration...............Unknown
.............................................. Oral penetration.................... Unknown
Ejaculation............................Unknown
Weapon..................................Unknown
Physical force........................ Unknown
Restraint............................... Unknown
Threat................................... Unknown
Coercion............................... Unknown
Fear...................................... Unknown

## At time of exam

Most recent sexual contact ☐....... More than a week ago

## Significant medical history

Last normal menstrual period began....... 7 _See note_
Vaginal tampons last used......................
Last normal bowel movement................ 11/12/2013
Recent constipation.................................No
Recent diarrhea......................................No

## General appearance

Alert
Cooperative
Maintains eye contact
Speech clear

## Bodily surface injuries

See attached diagram

## Genital examination (Please see attached diagram for details)

Tanner stage
    Breasts...... 5
    Genitals.....5

_Jack RN SANE-A_

Signature of examiner

Patient name: **Rivera, Mary**
Case: **13-3140743**
Date of exam: **11/12/2013**
MR #: **1022503**
DOB: ███████

Austin/Travis County Sexual Assault Nurse Examiners
Sexual Assault Forensic Examination Report

Labia majora.......................................... No trauma
Labia minora.......................................... No trauma
Hymen.................................................No trauma
Posterior fourchette/fossa navicularis.. Trauma
Cervix...............................................No trauma
Perineum.............................................. No trauma
Anus................................................... No trauma
Other area(s) of trauma....................... periurethral trauma
Colposcope used.................................. 3.75, 7.5, 15x, with images
Toluidine dye used............................No

**Impressions from exam**
History of memory lapse
Head to toe exam with trauma
Detailed anogenital exam with trauma
Medical forensic examination completed

**Evidence items collected**
Oral swabs (4)....................................No
Oral smear..........................................No
Circumoral swabs (2)............................No
Neck swabs (2).................................... No
Breast swabs (4)...................................No
Vaginal swabs (2)................................. Yes, Blind
Vaginal smear...................................... Yes
Cervical swabs (2)............................... Yes, Blind
Cervical smear..................................... Yes
Pubic hair combings and comb.............No
Pulled pubic hair standards...................No
Anal swabs (2)..................................... Yes, Blind
Anal smear........................................... Yes
External genital swabs (2)..................... Yes, Blind
External penile smear........................... No
External penile swabs (0)...................... No
Buccal swabs (2)..................................Yes
Purple blood tube.................................No
Tampon...............................................No
Sanitary pad.........................................No
Fingernail swabs (4).............................. No
Right & left palm swabs (4).................. No
Head hair combings & comb.................No
Pulled head hair standards....................No

_Black RN SANE-A_
Signature of examiner

Patient name: **Rivera, Mary**
Case: **13-3140743**
Date of exam: **11/12/2013**
MR #: **1022503**
DOB: █████

Austin/Travis County Sexual Assault Nurse Examiners
Sexual Assault Forensic Examination Report

Changing paper........................................No
FTA card................................................Yes
Other......................................................No

**Items sent that are not in kit**
Paper bags (how many).. none
Urine sample...................Yes
Blood sample...................Yes
Clothing..........................None
Other..............................None

**Examiner notes**
Guardian states that patient's last menstrual period was around 2004.

_Black RN SANE-A_

Signature of examiner

Patient states that she recalls no sexual contact.



RIVERA.MARY DELAROSA
Acct#: L00071683103 M/R#: L001022503    ER
Loc:L.ER
Dr: CAPITOL ███████ █ /F

Signature of patient:

_____

Signature of examiner:

_____ RN SANE-A    APPENDIX 1

96

Acct#: L000716831103 M/R#: L0001022503
Loc:L.ER
Dr: CEA
DOB: 11/12/13

-bruise
1.5cmx1cm

abrasion
0.5cm x
3cm

ulcer
1cmx1cm

J Black RN SANE-A

# BODY DIAGRAMS

RIVERA, MARY DELAROSA
Acct#: L00071683103 M/R#: L001022503
Loc:L.ER                    78 /F
Dr: CEA              DOB    11/12/13
ER



no trauma



*Black P.N SANE-A*

# EXHIBIT 4

# STATEMENT

My name is Jenny Black. I am a certified sexual assault nurse examiner. I performed the medical forensic examination of Mary Rivera on November 12, 2013 at St. David's Medical Center. My examination found bruising on the posterior fourchette and periurethral areas of Ms. Rivera's vulva and bruising on her posterior vaginal wall. These findings definitively indicate penetration of the female sexual organ.

_____
Jenny Black, BSN, RN, SANE-A, CA-SANE